UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 Cr. 602 (RA)

MICHAEL HILD,

Defendant.

------------------------------x

New York, N.Y.
April 14, 2021
9:30 a.m.

Before:

HON. RONNIE ABRAMS,

District Judge

APPEARANCES

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
JORDAN ESTES
SCOTT HARTMAN
Assistant United States Attorneys

BEN DUSING
KATY LAWRENCE
Attorneys for Defendant

ALSO PRESENT: RACHEL TROY, USAO paralegal
ADAM BASINGER, Defense paralegal

(Jury not present)

THE COURT: Good morning, everyone. I wanted to follow up on last week's pretrial conference with two additional notations. First, regarding defendant's first motion in limine based on the government's April 12 submission, it appears that the issue is moot. Are we all agreed on that?

MR. HARTMAN: From our perspective, it is. We set forth our understanding of what the defendant wasn't objecting to. It is, as we stated in the letter, still our intent to present this analysis of the Live Well bond. We're not going to present any analysis comparable bonds.

MR. DUSING: We agree, your Honor.

THE COURT: All right. So it seems like you all have come to agreement regarding all of the audio recording except for the one from March 30, 2017. I do have your letters on that, but given how technical this is in nature, I thought it was more productive for me to hear you out for you to walk me through it. We all know the standard of the rule of completeness, so I think it would be most helpful for me is for you all to walk me through that. I'm happy to do that now. If you could tell me when you intend to admit that call, today or tomorrow?

MR. HARTMAN: So the first witness is Mr. Stumberger. We are not planning to offer the call through Mr. Stumberger, I don't know it will come up on cross. We -- this is all a

discussion of --

Judge, could I step back and give you a little context?

THE COURT: Please.

MR. HARTMAN: So every month at the end of the month the trading desk prepared a series of scenarios for Mr. Hild's approval, and Mr. Hild looked at scenarios, and what they were were a series of assumptions. Scenario one was one set of assumptions, scenario two is a different set of assumptions, scenario three was a third set of assumptions. And they're assumptions about how to model a bond. Things affect the bond values. One of them is interest rates, one of them is the yield for the bond, there's others as well, and there will be testimony about that. And the presentation also included analysis of how -- if you were to implement these assumptions and change the marks based on assumptions, it would affect the value of the portfolio.

And I'm sorry the paralegal is not here because we could display an exhibit for you, and I texted them so she will come down and we can do that. But there's a spreadsheet that goes along with this recording that shows, I think it's five or six scenarios, and it shows what the bond assumptions were and then it shows if you implement these assumptions the value of the portfolio would go up on down or stay the same.

It also shows at the bottom, if you implement these

assumptions, what it would mean in terms of what the lenders would require, repo lenders, the people who were financing these bonds, as far as the margin call. So if the value of the bond goes up, then Live Well had the right to reverse margin call lenders and demand more cash for them. If the value of the bond went down, then the lenders had the right to say you're under collateralizing.

(Interruption by court reporter)

THE COURT: I'm going to stop there on something unrelated. This is a good the reminder of how hard it's going to be to try being double masked, and I think we all have to just be conscious of it. It's up to you. You also should feel free to let me know if I'm hard to hear or understand as well.

MR. HARTMAN: Maybe this will help.

And could you put up for the judge that spreadsheet from March 30 when you load it up.

So Judge, what you will see is there's this presentation that was prepared, and it was circulated right before this call. And what it showed was how each of these scenarios would affect the value of the Live Well's bond portfolio.

If you choose set of assumptions one and set prices to IDC and the lenders based on a set of assumptions one, the bond portfolio would go up or down. Scenario two would have an affect up or down. Scenario three would have an affect up or

down. And at this time, which is March 30 of 2017, the portfolio has been marked up tremendously. And I know the Court is familiar with the allegations in the case, so starting in September 2014 and then continuing -- or excuse me, 2015 and continuing through especially in February and March of 2017, the value of the portfolio is very high, because the marks have been increased substantially.

And what is going on in this call is they're looking at this analysis.

THE COURT: I want to stop. So Mr. Hild is not here now. I assume you waived his presence for purposes of this argument.

MR. DUSING: That's correct, your Honor. The word we got was attorney's only, so if that's my bad, that's my bad, but we waive his presence.

THE COURT: That's okay, please proceed.

MR. HARTMAN: So what they're doing on this call is looking at the analysis and trying to understand it.

This is the cover email, Government Exhibit 201, and you can see there's an email on March 30 at 3:49 p.m. right before this call, which is at 4:09 p.m. And this is circulated to Mr. Rohr Mr. Hild. And Mr. Rohr is the CFO of the company. And said March month in.

And if we could see Ms. Troy, the attachment. If you zoom in the top part.

Scenario one of models, what would with the effect of the story the portfolio marks to February month end. And that's scenario one. What if we went back and reloaded the prices that were in place at the end of the month, what would be the effect of that?

So where it says net DOD margin call impact --

THE COURT: When you're asking that question, who is asking that question?

MR. HARTMAN: Mr. Hild, or Mr. Hild and Mr. Rohr who ultimately made the decision about which scenario to implement asked the teams to model this. What would happen if we went back to February marks.

So there's two different things going on. So one is how would the change in marks affect the margin call or when the lenders were required to be repaid to them when the values went down, and they net DOD margin impact 11 million, if we went back to February marks we would owe the lenders back $11 million. So that's the first thing that is going on.

The second thing that is going on in scenario one is things have changed since the end of February, interest rates have changed, and so they have to figure out not only what was the marginal call impact going back to February and March would, but also in order to produce those marks through the model, they have to solve for other variables. And this is not something we're going to spend a lot of time with for the jury,

but I'm explaining this to the Court because it's helpful to understand what is going on.

THE COURT: It is helpful.

MR. HARTMAN: I realize it's incredibly confusing. We spent years trying to understand it, so if you have questions, please let me know.

There's three basic variables, there will be testimony on this, that are considered in valuing these bonds. The first is interest rates, the second is prepayment schemes, so how quickly the underlying loans will pay down, because if the underlying loans pay down then the value of the bond decreases. And so if prepayment speeds up, the value of the bond goes down because the time value of the bond is less. The bond is going to end earlier so the bond is less valuable. If prepayment speed slows, then the bond will last longer and so the price should go up. And in this the third variable is the yield, which is what the market would require to the return on investment. Those are basically the three variables that are being modeled in all these scenarios.

And so for scenario one, what is going on is they're saying if we know we want the marks to be where we were at the end of February, what assumptions do we have to implement --

THE COURT: For the record, she didn't hear anything. The door opened and closed immediately.

Tell the juror Allison there's a juror walking

outside.

You may proceed.

MR. HARTMAN: There's two different things going on here. One is what would be the impact on liquidity and the marginal call going back to February marks. And that is not affected in any way by changes in interest rates or changes in economic factors during the February to March month end because the liquidity requirements are dictated by what the bond values are. So the lenders look at what the bond values are and they say we're under collateralized or over collateralized given what you borrowed. So the stuff on the right here, at least I'm talking about scenario one here, scenario one is fixed based on the facing fact that you're looking at February month end marks, because the change in marks is what affects what the repo lenders would require and marks are fixed in scenario one because it's February marks that they're going back to.

So then what they're doing in scenario one is back selling for -- interest rates are also fixed, because that's something that's an assumption that comes from the market. There's a curve. But they're back selling for what the prepayment assumption needed to be to have the model generate February month end marks. And that's what this number in the parenthesis at the end of scenario one is, 70.2. That's what they're solving for there.

And this is discussed in the call. I realize the call

is confusing, but the reason I'm explaining these two different things is the first part of the call is largely about the liquidity impact of the scenarios. The discussion of the $11 million number, the $11 million margin call, when Hild asked about that, and Mr. Foster says -- I can point to this in the transcript. He says -- this is page 66, excuse me, line 66, he says so the $11 million impact --

THE COURT: Do you mind using that page number that are connected to the jury submission on April 12, so the attachment there?

MR. HARTMAN: Sure. I thought we used these line numbers.

THE COURT: The line numbers are fine.

MR. HARTMAN: They're continuously numbered.

THE COURT: Okay. Go ahead.

MR. HARTMAN: So line 66 page 3, we that thought that would be easier.

So line 66, Mr. Hild says so the 11 million impact that is being shown here is already accounting for something that we already knew about and already did, or is that something new on top of what we understood would be the case before?

What he's asking about is that value in the column page there for scenario and one, the negative 11 million, 11.9 million.

THE COURT: All right.

MR. HARTMAN: That's what he's asking about, so he's asking why is it that when we -- why is it there's this big $11 million margin call that we produced from going back to February marks. And then line 132, Mr. Foster says -- 132, he says you were asking about the 11 million down in liquidity. Some of the answer -- this is what I was looking at before, some of the answer is we borrowed -- I think the answer is we borrowed some using the updated IDC prices, I believe. And Mr. Rohr says that's exactly what happened.

So what when they're saying is at month end the debt was X. They did increase marks, and because they increased marks they were able to borrow more from the lenders. And as a result, you can't go back to February marks without paying back some of that debt, because the lenders won't lend more than a certain percentage of the value of collateral, like 80 percent. So that's the part that we're focused on.

And then the part in yellow is Mr. Rohr talking about the fact that the portfolio can't be marked up any more. That relates -- there's a discussion in between, and we have agreed to inclusion of that discussion. There will be some argument about the relevance of that or not. But the context of all of this discussion is how the various scenarios affect the liquidity of the company.

And so in our letter, we talk about the idea that

Mr. Stumberger prefaces the call and says there's two different things we need to talk about, one is when what have rates done and one is what are the moves with respect to pricing done in terms of liquidity. So in our view, everything up to line 233 is about that.

The part afterward is about how the changing interest rates, which Mr. Hild describes as the change in static rates -- that's at line 239 and 240 -- is affecting the other component that I referenced, which is how -- what prepayment assumption you have to use to generate these marks. And so there's discussion about the fact that rates have moved and changed, and as a result, the prepayment assumption has to slow down, because in order to produce the same marks, you have to slow down the prepayment assumptions.

Does that make sense?

THE COURT: Yes.

MR. HARTMAN: That's about the 77.2 number. Our view is everything else in here is about that, and then it's also about how these rates affect some of these other scenarios where price is not fixed.

So scenario three, for example, and it's scenario four and five, there will be testimony about this, we're looking what a market rate assumption of these bonds would produce in terms of liquidity. There, because prices are fixed, a change in rates will have an affect on liquidity because they're

solving for price. But for the first scenario where price is fixed, that whole discussion is just about what prepayment assumption is required.

I can go on about this.

THE COURT: I guess what I really want to get at is how you respond to -- and I will hear Mr. Dusing, I'm sure he will articulate it better than I can, but why these concepts are unrelated.

MR. HARTMAN: I think the reason they are interrelated is because they're two discussions of totally different things. They're interrelated in the sense that if you're doing this properly, rates would affect what your liquidity requirements would be. If you did a good faith effort to model these bonds, then what your assumptions would be would be dictated, among other things, by rates, and that would affect liquidity.

But with respect to scenario one, the prices are fixed. They're saying what if we backed out these increases, what is that going to do to liquidity. And that's not really about rates, that's just about how much money do we have to come up to to go back to February marks. That's the bottom line. And I'm happy to answer any questions about that.

THE COURT: What Mr. Dusing's position is in the letter is the call returns multiple times to the subject of the effect of potential interest rate movements on the bond valuation. Is that not right?

MR. HARTMAN: I think that is right, but the discussion in the beginning is not really about bond valuation, it's about the bond valuation is fixed for scenario one, the 11 million, it's not discussion about bond valuation, it's just a discussion of like what's the liquidity impact of going back to February marks. And the one way it does factor in is the question about the prepayment assumption, the 77.2 number, but that's also separate from the liquidity, the $11 million liquidity discussion, because that's a question about if we implement these prices what do we have to say the speed is.

THE COURT: All right. Do you want to be heard on this?

MR. DUSING: Briefly, your Honor.

THE COURT: Thank you.

In terms of timing, do you expect you want to introduce this before lunch?

MR. HARTMAN: No. So I do not think -- we're not going to offer it on Mr. Stumberger's direct.

THE COURT: You mentioned earlier there may be a question about you would introduce it on cross.

MR. DUSING: If the government does not use it on direct for this witness, we would not use it on cross. So I think there may have been some other issues that came on line with respect to recorded calls.

THE COURT: All right. Why don't we -- I think let's

just talk about what we need to talk about, so we don't keep the jury waiting, anything relevant to this morning or ideally the rest of the day, and we can continue to discuss everything else after.

MR. HARTMAN: I think it might help, Judge, if you hear some of the testimony, because I think it will be a little clearer.

THE COURT: All right. We still have a few minutes, so I'm happy to hear you.

MR. HARTMAN: A couple of logistical questions. Do you intend to take a break after the opening statements?

THE COURT: I can.

MR. HARTMAN: If we could have five minutes. There's no witness room. I think there's one in the back but the witness is upstairs. If we could have five minutes to get him here and on the stand, that would be great.

THE COURT: Sure.

MR. HARTMAN: And I know in the Court's individual rules the Court request that the parties admit exhibits before the witness is on the stand. Is that something you want us to do here? We have our list of exhibits so we could tell you what they are right now.

THE COURT: No, I think you should -- look, if there's consent, you can admit them before the witness is on the stand, but my normal practice is to admit them when the witness is on

the stand.

MR. HARTMAN: Maybe I misunderstood.

THE COURT: But in any event, if there's an objection, we can admit them beforehand, but if there needs to be foundation, of course we need to do it through the witness.

MR. HARTMAN: Okay, we'll confer on that. I expect there probably won't be a lot of objections, I don't know.

THE COURT: All right.

MR. DUSING: Thank you, your Honor, I will try to be brief. First, with respect to GX 412, which is what we're discussing, I agree with Mr. Hartman this is pretty complicated stuff, so I think it will be helpful to the Court to hear some background about it. But it's quite simple, the objection, with respect to this.

This is a recorded call, secretly recorded. It's an hour long. There is four or five lines that I think uncontextualized sounds really, really bad. If contextualized they have an entirely different meaning. The government has proposed to end the recorded call, which is only 200 lines into a thousand plus line transcript, right at the end of that very, very, very bad sounding excerpt.

Our rule of completeness objection is that it would be very misleading to the jury to have them hear only that portion and that it needs to be properly contextualized. There is a lot said after that bears on the meaning of the excerpt in

question. For all of the other government supported calls they seek to introduce, there is stuff before and stuff after and it properly contextualizes the government's selection. This is the only call where there is resistance to including parts of the call after the part in question and we think it's essential.

So this is a recorded call that's over an hour long. It's very early in the call where this selection is, and there are many things in this call that circle back and bear upon the selection. So we would sort of respectfully disagree with Mr. Hartman's binary characterization of there are two things discussed on this call, first we discussed the one thing, then we discussed the other thing. I think a fair read of the transcript makes clear that that is really not the case. The reason that both of these things are being discussed is because they interrelate. I think Mr. Hartman acknowledged that.

So there's a discussion of sort of the portfolio situation and then there's these frolics about interest rates, interest rate projections, the transcript and conversation and the parts of those issues, but then it does come back once, twice, three times to the main issue. So we propose that the bigger portion of the call come in otherwise the excerpt cited by the government is going to be really misleading to the jury, and worse, if that's where it ends up, the jury could get the impression that is the end of the call. So this is an hour

long call and we're maybe 14, 15 minutes in this.

THE COURT: I think what would be helpful -- and just, Allison, let us know when the jury is here.

DEPUTY CLERK: We're missing a few.

THE COURT: We could talk about this a few more minutes or anything else we need to talk about, but when you say it comes down to this issue a couple more times, show me exactly where that is. Do we need to get the whole call in?

My understanding is, to the extent that I'm unwilling to admit the whole call, you want to end it at line 305, but I really want you to show me the lines that you're talking about and tell me why they are in fact related and could give the jury a misleading impression. I'm happy to do it now or later.

MR. DUSING: In the letter brief we submitted I identified by page and line three instances, so the Court can look at that and I could circle back later.

THE COURT: Okay. So in your letter you cite to three portions of the recording that you assert show that Mr. Hild returned to the matter, and one is page -- line 572 to 585. Should we all go there?

MR. DUSING: Yes, I think, your Honor, this is the kind of thing where it gets to highly, highly technical stuff and it has to be viewed in toto. So those three instances were examples of a non-exhaustive list, examples of where the conversations comes back. I don't think it's exclusive.

Personally, I think on the whole -- the call probably on a whole should be offered, but in the interest of compromise here and narrowing of this down, a portion of the call which included those three instances would be acceptable to the defense. That's why they're identified.

I want to move on and talk about two more pressing issues.

THE COURT: Yes, let's do that.

MR. DUSING: I may be raising issues that are not issues, I want to make clear. So government was very helpful, I appreciate that in the spirit of working through some of these issues so your Honor did not have many objections to work through, and I had an understanding and we had some productions last night of some new stuff, and I want to make sure we're on the same page.

So there's a defense recorded call. So the government marked portions of the recorded call, the defense marked portions of the recorded call. The government recorded call and transcripts that correspond, the defense recorded call exhibits and the transcripts that correspond. And we received some material yesterday where in one part of a defense exhibit recorded call and transcript I think the government added about nine pages of material. I could be mistaken about that, so I want to be careful here. But if that is the case, we do need to address that because we marked -- the selections we marked

for a reason, and maybe there wasn't --

THE COURT: Let's talk about that.

MR. HARTMAN: Sure.

THE COURT: If you want to meet and confer, why don't you do that?

MR. HARTMAN: That would make sense because I don't know, I'm not exactly sure I conferred.

THE COURT: Why don't you do that.

MR. DUSING: Does it make sense if I mention the other exhibit?

THE COURT: Sure.

MR. DUSING: The other, it appears the government added an exhibit, Government Exhibit 414, which is a recording, then Government Exhibit 414-T, which is a transcript of that recording. Again, I'm going to be -- I want to make sure that I understand, I could be way off, but both of those things are new, and they might -- if they're used in Mr. Stumberger's testimony, we need to address them beforehand.

MS. ESTES: Your Honor, Government Exhibit 414 the defense previously marked that as Defense 27, so we remarked it with a government sticker.

MR. DUSING: Issue corrected. We can cross that one off.

THE COURT: Okay.

MR. DUSING: Perhaps we can the previous one, too, but

I will confer with Ms. Estes and Mr. Hartman.

THE COURT: Do you want to take a minute?

MR. HARTMAN: Yes, could we have a minute?

THE COURT: Go ahead.

MR. DUSING: Your Honor, government clarified and we can hold off on that issue.

THE COURT: Are there any other pressing issues that may affect the testimony this morning, opening statements or this afternoon?

MR. DUSING: Not from the defense's perspective.

MR. HARTMAN: We're going to give Mr. Dusing a list of the exhibits that we expect to use if we have agreement.

THE COURT: Thank you. We'll continue to address the March 30, 2017 letter later today.

Does anyone need to use the restroom or anything?

MS. ESTES: We're ready, your Honor. Just to confirm, is the line to the public open? Somebody called our office yesterday about it.

DEPUTY CLERK: It is.

MR. DUSING: The defense is prepared, your Honor.

THE COURT: Okay. Thank you.

How long do you anticipate your openings will be?

MS. ESTES: Your Honor, the government's will be about 15 minutes.

MR. DUSING: The defense's will be about 15 minutes.

THE COURT: Then we'll take a short break and come back in.

During openings you're not using exhibits?

MS. ESTES: No, we're not.

THE COURT: Okay.

(Jury present)

THE COURT: Good morning, folks. Thank you all for being so prompt today. It's much appreciated by all of us.

We're going to begin today with the opening statements of counsel. The government's attorney will make an opening statement and then the defense attorney can make an opening statement if he would like to as well. I should tell you that the opening statements are neither evidence nor argument, they're simply outlines of what the attorneys believe the evidence will show in this case and they're given to help you follow the evidence as it is presented.

One thing I will say is during the course of the trial if at any time you are having trouble hearing anything -- of course, we're double masked -- please raise your hand, or if you can't see something on your screen, please raise your hand and let us know.

With that, let's hear from the government.

MS. ESTES: This is a case about greed and lies. It's about how this man, Michael Hild, deceived his lenders. He was the CEO, the boss, at a company called Live Well Financial. He

and others in his company tricked their lenders into lending tens of millions of dollars more than they otherwise would have. Now why did he do it? To increase his company's assets and to line his own pockets. You will learn that he ultimately got over $20 million in extra pay as a result of the scheme.

And ladies and gentlemen, that's why we're here today, because Michael Hild defrauded his lenders to the tune of tens of millions of dollars. We're here to hold him accountable for his crimes.

So what will the evidence show? You will learn that Michael Hild founded Live Well Financial. The company specialized in reverse mortgages. And you will hear a lot about those during the course of the trial, but it's really just a particular kind of mortgage. If you wanted a reverse mortgage, you could go to Live Well.

Now you will learn that in 2014 Michael Hild decided to add to Live Well's business by investing in portfolio bonds. And a bond is just a type of debt you can invest in. It's a security. You can trade a bond like you trade a stock.

(Continued on next page)

So in 2014 Live Well purchased approximately 20 bonds for about $50 million. Now Live Well didn't just shell out $50 million from its bank account to buy the bonds. You will learn that it borrowed money to buy the bonds, and that's entirely normal. It's called using leverage.

Live Well borrowed the money to buy these bonds in a couple of ways. The bond portfolio served as the collateral. It secured the loan.

What does that mean?

Well, think about it in the context of a mortgage. When you take out a mortgage to buy a home, the mortgage is secured by the house. That's the collateral. So if you can't pay the bank back the bank can foreclose on the home, sell it, and use that money to cover the debt, and it was supposed to work the same way here. If Live Well couldn't pay the lenders back the lenders could sell the bond portfolio, the collateral, to get the money they were owed.

Now, there's one very important thing you will learn about these lending arrangements. The lenders required a neutral third party to price the collateral, the bond portfolio; that is, somebody who didn't have a stake in the transaction.

Why did they do that?

Again, go back to the mortgage example. A bank requires a neutral third party appraiser to come in and value

the home. The bank doesn't rely on the borrower to say what the home is worth. That person might have an incentive to shade the truth, to say it's worth a million bucks when it really isn't. So the bank requires a third party, somebody neutral, to come in and say what the home is worth.

The lenders required the same thing here. They required an independent third party to price the bonds. And you will learn that what they were looking for there was the market price. That's how much somebody would pay for the bonds if you went out on the market and tried to sell them. That price mattered to the lenders because it determined how much money they would lend to Live Well. And if the bonds were worth more, they would lend Live Well more money. If the bonds were worth less they would lend Live Well less.

Now, the third party here, you will learn, was a pricing service called IDC. And its job was to provide prices for bonds and other securities, not just to Live Well, but to all sorts of different market participants. The lenders rely on those IDC prices in determining how much to lend to Live Well. They track the prices. If the prices went down, the loan amount would go down. And in that situation Live Well would have to pay some money back to the lenders. It's called a margin call.

Now you will learn that Live Well had a trading desk based in New York and New Jersey, and they also tracked the

prices of these bonds and they would send those prices to Michael Hild. He was their boss. And he kept a close eye on the bond prices because they were important to Live Well's bottom line.

Now, in 2015, Michael Hild and the trading desk figured out a way to manipulate the IDC prices. You see, IDC had been publishing its own prices for the bonds. But they were lower than what Live Well expected. They were leading to margin call after margin call from Live Well's lenders.

Michael Hild was unhappy. He hated having to pay money back to the lenders. So, the trading disk convinced IDC to let Live Well price the bonds. And you will learn that IDC was asleep at the wheel here. Live Well would send their prices to IDC, and IDC would turn around and submit those exact prices out to the market, including Live Well's lenders, but the lenders had no idea they were no longer getting market prices. They had no idea they were not getting prices from a neutral third party. They had no idea they were coming from Live Well.

So Michael Hild and the trading desk, they seized on this opportunity. They didn't have to provide market prices. They could provide any prices they want. They could provide prices that were sky high, that had no relation to reality.

And that's just what they did. You will learn that in September 2015, Michael Hild directed the trading desk to start

pricing the bonds using a method called Scenario 14. That was the code name for the fraud, ladies and gentlemen, Scenario 14. You will hear it throughout the trial.

Now, there was a problem with the Scenario 14 prices. They weren't market prices. They were much higher than market value. They were jacked up. And that's exactly what Michael Hild wanted. These higher prices meant more money for Live Well.

And you will learn that the fact that these weren't market prices, that was no secret to Michael Hild. The trading desk told him again and again these are not marketable. We can't go out and sell the bonds in the market for these values. They told him again and again because they knew it was wrong. They knew it was wrong to submit these high prices and to have Live Well's lenders give Live Well more money than it was entitled to. They even started secretly recording calls with Mr. Hild around this time to show that he was the one directing them to pump up the prices and send them to IDC.

Now, ladies and gentlemen, you will learn that using these Scenario 14 prices would have increased the value of the bond portfolio by over $10 million. Now, that's an enormous markup. That's the kind of thing that might raise eyebrows. But Michael Hild wanted to keep it a secret. He didn't want IDC paying attention to higher prices. He didn't want Live Well's lenders paying attention to higher prices. They could

get caught. So he directed the trading desk to phase in the Scenario 14 prices, to increase the prices incrementally every few days over the course of a month.

And that's what they did. Over one month they increased the value of the bond portfolio by over $10 million. And that was just the beginning. You will learn this scheme went on for years, and that the markups continued all along the way.

Now, stepping back a bit, ladies and gentlemen, how do you know these aren't market prices. Well, you'll learn, for example, that Live Well would see a bond for one price, say a million dollars, and then it would immediately send a higher price to IDC, 20 or 30 percent more. Say $1.3 million. So overnight, overnight the price of the bond would increase by hundreds of thousands of dollars. That's the fraud.

And you will learn this was incredibly beneficial to Live Well. It could get more money from the lenders than reducing the prices, and they were also able to buy bonds for no money down.

So how did that work?

Well, Live Well would see a bond for one price, the low market price, and then it would jack it up and submit a high price to IDC. Then the lender would lend against that high price. That's all they would see is the high price. Live Well would get all that money, and it would go back and buy the

bond at the lower market price because the lenders were lending against that high price. Sometimes they would give Live Well so much money it had some more just for its own bank account.

You will learn that Michael Hild called this a self-generating money machine. Those were his words. You will hear that on a recorded call. Ladies and gentlemen, he was using the lenders as his ATM.

Now, over the course of the scheme, the cash started piling up, so Live Well bought more and more bonds. It increased the value of its portfolio exponentially you will learn that at the height of the scheme, Live Well valued the portfolio at over $550 million.

Now, ladies and gentlemen, you will learn that these fake IDC prices, they weren't the only part of the fraud. Live Well also lied directly to the lenders in its financial statements.

Now, what are those?

Those are important documents that show the financial health of a company. Is it profitable? What are its assets? What are its debts? The lenders relied on those financials in determining whether or not to lend to Live Well.

You will learn that one of Live Well's assets, one of its largest assets was the bond portfolio. And how did they value the bond portfolio in the financials? They used the same jacked up prices they were setting to IDC. And in the

financials they even said those prices were market value.

That was a flatout lie. And it wasn't the only lie in the financials. They also lied about their revenue, and they hid that it was largely from the inflated values in the bond portfolio.

Now, ladies and gentlemen, what did Live Well do with all of this extra money?

You are going to learn that Michael Hild and his coconspirators, they got bigger bonuses, and Michael Hild also used the extra cash to buy control of the company. And you will learn exactly how he did that during the course of the trial, but as a result of that buyout, as a result of this fraudulent scheme, he ultimately got over $20 million in extra pay.

Now, the scheme started to unravel in 2018. Two of Live Well's lenders started asking questions. They noticed the IDC values were higher than market. They tried to shut down the loans. But Michael Hild told the lenders Live Well couldn't pay them back. They didn't have the money, even though some of the money was going into his own bank account. And Live Well couldn't go out in the market and sell the bonds to repay the lenders, because the lenders had lent against those hijacked up prices. If they had gone to the market to sell the bonds at the regular market values they would never have enough money to pay the lenders back. So Live Well

entered into bankruptcy, and you will learn they determined that the bond portfolio had been overvalued by over $200 million.

Now, for his involvement in this scheme, Michael Hild has been charged with securities fraud, wire fraud, and bank fraud.

How are we going to prove it to you?

First, you will see and hear the defendants' own words. You will hear those recorded calls are from the heart of the scheme. You will see e-mails talking about Scenario 14 and the huge market markups that resulted.

Those calls and e-mails will make clear that there was nothing legitimate about what Michael Hild was doing, and they will make clear that he was the one directing the scheme every step of the way.

You are also going see those financial statements you will see the lies in those financial statements the ones that went to the lenders in black and white.

And, third, you are going to hear from witnesses. You will hear from representatives of the lenders. They will tell you how they never would have lent to Live Well if they knew Live Well was behind the IDC prices. They will tell you how they never would have lent as much as they did if they knew the prices weren't market value. They will tell you how much the value of the bond collateral, how much that mattered to them.

And they will tell you how they were stuck with the bonds when Live Well went into bankruptcy.

You are also going to hear from members of the defendant's own criminal scheme, former Live Well employees who were involved in submitting the fake prices to IDC. They will take you inside the conspiracy. They know how the scheme worked because they were part of it.

Now, ladies and gentlemen, make no mistake. These former employees in the scheme they are criminals. But you will learn that they have accepted responsibility. They've pled guilty. And you will learn that they are testifying not only out of the goodness of their heart, but because they're hoping to receive leniency at sentencing. So, when you consider their testimony, look at it closely, and carefully ask yourself whether it makes sense and whether it lines up with the other evidence in the case, with the recorded calls, with the e-mails, with the financials.

At the end of this trial, you will have heard overwhelming evidence that the defendant is guilty of the crimes he's charged with.

Between now and then I would like to ask you to do three things:

First, pay close attention to the evidence;

Second, follow Judge Abrams' instructions on the law; and

Third, use your common sense, the same common sense you use in your everyday lives as New Yorkers.

If you do those three things, the defendant will get a fair trial, the government will get a fair trial, and I am confident you will return the only verdict consistent with the evidence, that the defendant is guilty as charged.

THE COURT: Thank you.

Just a second. We have various safety protocols.

You will see that I am going to ask defense counsel if he would like to make an opening statement. That's because it's the government that has the burden of proof. The defendant has no burden to prove anything at all. So, they didn't have to give an opening or introduce any evidence. That's why I am going ask if Mr. Dusing would like to give an opening.

MR. DUSING: May I proceed, your Honor?

THE COURT: You may. You may proceed.

MR. DUSING: May it please the Court, opposing counsel, ladies and gentlemen of the jury, the public, my name, as the Court said, is Ben Dusing. I have the privilege of representing Mr. Michael C. Hild, obstructed from view in part behind me. We are looking forward to beginning this journey.

So, I am from Kentucky. I probably talk with an accent. I don't know. You will be listening to it for some time. I am not going to be all folksy and cliche here, but I

do want to begin with this. As it turns out, I am from a small town in Kentucky. My father is a lawyer. When I was a young boy, I turned to my father and I said, "Dad, what is a trial?" because this word kept coming up.

And he told me, "Son, a trial is nothing more than a search for the truth."

I have to tell you, I have forgotten a lot of things that my parents told me, but I have not forgotten that, and I am never more cognizant of it than on mornings like this, when we begin a journey together.

We have an adversarial system. The government's over there. We're over there. The Court's up there. But this is not an adversarial project. We begin together collaboratively to search for the truth. And that's an exciting thing. We can all be proud of that. It is a common journey.

Now, these are interesting times, as we can see. I have had the privilege of giving speeches like this, if you will, many a time, never before confined by plexiglass. We are going to have to work harder, struggle harder, lean over more, look around plexiglass, accommodate one another to find the truth. But it is a common purpose, and we are going to do that.

So I thank you in advance and join Ms. Estes in recognizing the special sacrifice your service represents, particularly in this instance, where we are going to have to

ask even more of you. You are going to have to look around plexiglass to find the truth.

So, on behalf of Mr. Hild, we thank you in advance.

Now, Ms. Estes on behalf of the government said some things about the facts of this case and what we are going to see and what is it going to show and all that. I guess what we would say at this point is we probably disagree about that. We haven't seen any proof yet. We haven't heard any proof yet. The purpose of opening statements is just to give you an idea of why we are here. What's about to come. The proof will be the proof. The testimony will be the testimony. The documents will be the documents.

And that is your sacred province. You are the most important people here. The practice of law in this regard reduces very simply to the application of facts to be found by you applied to law to be given to you by the Court, by the judge, at the end. That is what yields your verdict.

At the end of all this, I will appear before you, and I will stand right here and I will ask you to find Mr. Michael Hild not guilty for one reason and one reason only, because the facts as found by you applied to the law as instructed to you by Judge Abrams compel that result. That's what this is about.

Well, more broadly what are we doing?

What is the basic allegation?

I think Ms. Estes did a good job of summarizing the

government's version of this, and I don't feel it necessary at this point in time to get too far down the path here in terms of the proof. After all, that's your job. It will come in here and it will walk out. It will show up on the screen and it will be taken down.

At the end of the day, I submit to you that the issue here is one thing and one thing only, at least in terms of the law: What was Mr. Hild's intent? What was his intent?

Ms. Estes correctly identified there are various charges, and they will be explained to you by the Court in the end, and there's a lot of big words that are used throughout all of those. But I submit to you it will reduce, all of it -- all of it -- to this very, very, very simple question: Did Mr. Hild have, for lack of a better term, good intent? Was he acting in good faith? Or, on the other hand, did he intentionally try to defraud people? Was his intent nefarious? Was his intent bad.

That is the issue, the issue to be decided in the case.

Now, that is a colloquial summary of the law. The Court will give you a more fulsome explanation at the end, but for purposes of guiding your view of the evidence as it comes in and for purposes of helping you determine what is and what is not relevant, I submit that that's a good basic barometer: How does it relate to Mr. Hild's intent?

If the expectation is of big majestic speeches from defense counsel, I'm sorry to disappoint. I don't have too much more, but I do want to offer a few things for your consideration as you see the proof come in and as you evaluate it.

The first is, funny thing about truth. We talk about the whole truth. Witnesses will come in, they'll pledge an oath to tell the truth, the whole truth, and nothing but the truth. I think the whole truth is an important concept to remember throughout this trial.

Ladies and gentlemen, regrettably I have to tell you I think the government would agree the subject matter of this trial is complicated. It is complex. We will be talking about, I anticipate we will hear proof about securities that are among if not the most complicated financial instruments in the history of history.

OK. In that sense, we're going to talk about things like prepayment speeds, and you are going to hear terms like HECM IO and all kinds of stuff that sounds a little bit complicated.

We are going to have to engage in that stuff because the truth is found within the complexity, not despite it. Within the complexity, not despite it. Our job here is to expose to you, to reveal to you the truth.

So when you see a question, I submit you should ask

yourself, is this the whole truth? And, if it is not, is it then the truth?

Further, I think it prudent to bear in mind that which we all know. The truth doesn't change. Truth is not pliable. Truth stays the same. The one question you should consider for yourself is, is the proof that you are hearing changed? Has it changed from the past? Are witnesses saying now a different truth than they once told? These are the kinds of things that I submit for your consideration as we travel this journey.

Furthermore, I respectfully submit that it's appropriate for you to consider along this journey whether the truth has a motive, whether it has an angle. These are important considerations in the evaluation of truth.

I respectfully submit to you that the truth does not have a motive. It does not have an angle. It just is. I respectfully submit as you evaluate the proof as you see it come through the door, as you look at it on the screens, that you bear these principles in mind.

I further respectfully submit that you consider or appreciate the principle that from a certain perspective the best way to tell a good lie is to only tell part of the truth.

I submit to you, ladies and gentlemen, I anticipate we'll see, we haven't even yet begun, but I anticipate, ladies and gentlemen, that you will hear perhaps part of the truth, and then you will hear the whole thing. The instructions from

the Court, common sense dictates that you should form your opinions and evaluations and draw your conclusions from the whole truth.

I would respectfully submit a few helpful things to think about along the way. I don't have too much more. I would say this: How long is this going to take? It is something of the elephant in the room. We all have lives. This journey, this great experiment, this great noble venture that we all embark upon today together collectively, this search for the truth we recognize is a major inconvenience in your lives. There's no doubt about it.

It's part and parcel of being a citizen of this great country that we have to call upon our fellow citizens to serve as you are here today. We are ever cognizant of it. And I can confidently speak on behalf of the Court I believe and the government that this is a sacrifice for you and for those that depend on you. We thank you for that.

And how long will it take? Here's how long: As long as it takes to ascertain the truth. I respectfully submit that is as long as it should take. I don't really know when that is. I am not sure the government knows when that is. The Court surely doesn't know when that is. But we appreciate you. We appreciate your sacrifice. We will certainly be respectful of your time, but I think we recognize that what we are doing is serious work. We're doing it together, and the truth takes

as long as the truth takes. That's how long we'll be here.

Just a few more things.

The burden, of course, is on the government. It is not on the defense. There is no obligation for the defense, for Mr. Hild or me on his behalf to present any evidence in this case. It is not our obligation to prove anything to you. I submit we will. I submit that that will happen along the way. I submit that the version of history generally summarized in the government's view by Ms. Estes in her opening, that there is a different story. I submit in the end that it is likely that the proof will show that this is far less about prepayment speeds and HECM IOs and the most complicated financial products, synthetic financial products in the history of the world, far less about that in the end than it is about very simple concepts that pervade all of our lives, things like betrayal, throwing people under the bus, folks who apparently did things that they weren't supposed to do get in trouble for it and have a bigtime incentive to find other people, bigger fish, if you will, to blame it on to save themselves.

All of that is for you to decide. All of that will be decided by you in the end.

Ladies and gentlemen, on behalf of Mr. Hild, I sincerely thank you for the sacrifice you're about to make. I thank you in advance for your diligence, especially in these special times, and your commitment to ascertaining the truth.

I ask only this, only this, the same thing the Court will ask of you, and I do believe the government at the end of this majestic voyage that we are about to embark upon: When we get to the end, that you take the facts as you found them, all of the facts, the whole truth, and you apply it to the law that the Court provides and you reach your verdict based on those things. I will stand right here and ask you to acquit Mr. Hild on the basis of those things.

Thank you.

Thank you, your Honor.

THE COURT: Thank you.

All right, folks. We are going to take a short break to get set up for the testimony of the next phase of the trial. I am going to remind you just to keep an open mind and not to discuss the case.

Thank you.

(Continued on next page)

(Jury not present)

THE COURT: I will see you all in five minutes. Thanks.

(Recess)

THE COURT: I am thinking that we should take a late lunch today, since the break went longer than anticipated. I'm hoping we can go until 1, 1:15 something like that.

Does that work?

MR. HARTMAN: That's fine with us. Thanks for letting us do this. It helps to check out the audio.

THE COURT: I understand we've also had a number of technical issues.

MR. HARTMAN: Just so the Court is aware, I expect the direct is going to be three to four hours.

THE COURT: OK.

MR. HARTMAN: I don't think we will be done by lunch, but we may finish the direct today.

THE COURT: OK. You can tell me when it is a good time to stop, but I would like to go at least until 1:15, and then maybe we can take 45 minutes for lunch.

MR. HARTMAN: Sure.

I will tell you I might kind of get in the zone, so if it gets to 1:15 and you -- Ms. Estes is going to let me know.

THE COURT: That's fine.

(Jury present)

THE COURT: Everyone can be seated. Thank you.

So, folks, before we proceed, I am going to give you some additional preliminary instructions to help guide your participation in this trial. They may be a little bit repetitive with what I have said thus far, but they are important.

It's going to be your duty to find from the evidence what the facts are. That's your job in this trial. You and you alone are the judges of the facts. From the evidence presented at trial, you will decide what happened, and you will decide how to apply those facts to the law as I will give it to you. You must follow the law as I will explain it to you, whether you agree with it or not.

Nothing I say or do during this trial is intended to indicate what your verdict should be, so please don't speculate as to what I may be thinking. The evidence from which you will find the facts will consist of the testimony of the witnesses and documents and other things received into the record as evidence.

The lawyers may also agree -- and the term we use is "stipulate" -- to certain facts. You are to accept those facts as true, although you must still decide the weight, if any, to be given to those facts.

Certain things are not evidence and must not be

considered by you as evidence.

First, statements, arguments and questions of the lawyers are not evidence, nor are the statements or questions that I ask of any witness. Objections to questions are not evidence. Lawyers have an obligation to their clients to make an objection when they believe evidence is improper under our Federal Rules of Evidence. You should not be influenced by an objection or my ruling on it. If the objection is sustained, the witness will not be permitted to answer the question, and you must ignore the question. If the objection is overruled, the witness will be permitted to answer the question, and you should treat the answer like any other. If you are instructed that an item of evidence is being received for a limited purpose only, you must follow that instruction. If I strike an answer or instruct you to disregard an answer, then that testimony is not evidence and must not be considered by you.

Anything you see or hear outside the courtroom, as I noted yesterday, is not evidence, and must be disregarded, for your verdict must be based solely on the evidence or the lack of evidence presented here in this courtroom.

One of your most important tasks will be to evaluate the credibility of the witnesses who will testify here at trial. It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject. I'll give you some

guidelines for determining the credibility of witnesses at the end of the case, but in the meantime please just listen carefully to the witnesses as they testify, and keep in mind that you will be called upon to evaluate their credibility and the truthfulness of their testimony.

It's important to remember that this is, of course, a criminal case. In a criminal case the government bears the burden of proving each essential element of the crimes charged beyond a reasonable doubt. The burden never shifts to the defendant for the simple reason that the law presumes the defendant to be innocent and never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. In other words, as to each charge against the defendant, the defendant starts with a clean slate and is presumed innocent until such time, if ever, that you as a jury are satisfied that the government has of proven that the defendant is guilty of that charge beyond a reasonable doubt.

The question naturally arises, what exactly is a reasonable doubt? The words almost define themselves. It's a doubt based on your reason, judgment, experience, and common sense. It's a doubt that a reasonable person has after carefully weighing all of the evidence. Proof beyond a reasonable doubt must therefore be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her affairs.

I must emphasize that beyond a reasonable doubt does not mean beyond all possible doubt. It's practically impossible for a person to be absolutely and completely convinced of any disputed fact that by its very nature cannot be proved with mathematical certainty. In the criminal law guilt must be established beyond a reasonable doubt, but not beyond all possible doubt.

If, after a fair and impartial consideration of all the evidence, you do have an abiding belief of the defendant's guilt, a belief that you would be willing to act upon without hesitation in or matters in the personal affairs of your own life, then it will be your duty to convict the defendant on that count of the indictment. If, however, you do not have an abiding conviction of the defendant's guilt, if you have such a doubt as would cause you to hesitate before acting in matters of importance to yourselves, then you have a reasonable doubt, and in that circumstance it will be your sworn duty to return a verdict of not guilty on that count.

Now, a few words about your conduct as jurors.

First, as I noted previously, during trial, you're not to discuss the substance of the case with anyone nor are you permitted to discuss it until you retire into the jury room at the end of the case to deliberate. You are simply not to talk about the case. Don't even discuss the case with each other until you begin your actual deliberations at the end of the

trial.

If you see the lawyers, and I know I said this yesterday, but it's just important so I am going to repeat it, if you see the lawyers in the hallways or any of the parties, they're not going to speak to you, and please don't speak to them. Again, they are not being impolite. They are just following my instructions.

Second, if anyone does try and talk to you about the case, just bring it to my attention by telling Ms. Cavale. Don't tell anyone else, even your fellow jurors, and don't talk about the case or read about the case or facts or circumstances of the case or anything you learn about similar facts in any other case, whether it's on Google or Facebook or anywhere else. Also, don't communicate to anyone about the case, whether by way of Twitter or any other social media site.

Again, this is a little repetitive, but just don't read, listen to, or watch any media reports, if there are any, about the case, similar cases or any of the individuals involved.

The reason, of course, is that you must not be influenced by anything you may see or hear outside this courtroom. If you inadvertently do come across a news report relating to this case, if there is one, just immediately stop reading, stop listening, stop watching, and again just tell Ms. Cavale.

If at any point you do recognize someone during the course of the trial, let Ms. Cavale know, or if you're sitting here you can just raise your hand and we can take a break.

Finally, keep an open mind throughout the trial and reserve judgment until after all of the evidence is in. Until you have heard all of the evidence and the closing arguments and my instructions on the law, you're really not in a position to reach any conclusions in this case. So please do keep an open mind until the trial is concluded and you retire to deliberate.

You are permitted to take notes during the trial, and you've each been given a notebook. Please write your name on the cover of the pad. If you do take notes, just keep them in your notebook. Obviously, for safety reasons, just make sure to keep your notebooks out -- are they keeping them in the courtroom.

DEPUTY CLERK: In the jury room.

THE COURT: Just make sure you know exactly where your notebook is. Don't mix it up with someone else's for health and safety reasons among other things.

I should tell you, though, that any notes you take are really for your use only. They're only to be used as an aid to your memory. Your memory, though, controls. If you do take notes, just be careful not to get so involved in taking of the notes that you are not observing the witnesses and you are not

listening and hearing the evidence.

Once you are in deliberations, if there is a disagreement between one juror's notes and another juror's notes or between one juror's notes and another juror's recollection, you can ask the court reporter to read back the testimony, because it's the official court transcript that controls and not any particular juror's notes.

During the course of trial, exhibits will be received into evidence. They will be marked by exhibit number. If there is an exhibit that you are particularly interested in seeing, feel free to write the exhibit number down, because we will give you any exhibits you would like to see at the end of the trial.

But, again, you know, we will be keeping track of it so don't feel like you have to write everything down, because we will give you a list of exhibits, and we'll send back whatever it is you are interested in.

So, we've already had opening statements. The next stage of the trial is that the government will present its case. The government will call its witnesses, and after each witness testifies on direct examination, counsel for the defendant will have the opportunity to cross-examine that witness.

After cross-examination, there may be a little bit of what we call redirect and recross.

Following the government's case, it will rest.

The defendant may, but does not need to, but may present a defense case, and counsel for the government will have the opportunity to cross-examine any witnesses testifying for the defendant.

But, as we discussed, it is important to remember that in a criminal case such as this a person charged with a crime has absolutely no burden to prove that he's not guilty. If the defendant chooses not to present any proof, that decision cannot be held against him in any way and cannot enter into your deliberations at all. I'll instruct you on this in more detail at the end of the trial.

After the presentation of evidence is completed and both sides have rested, the attorneys will deliver their closing arguments and summarize and interpret the evidence. Just as the lawyers' opening statements are not evidence, their closing statements aren't either.

Following closing arguments, I will give you the instructions on the law.

And then, finally, you will retire to deliberate on your verdict, which must be unanimous and must be based on the evidence presented at trial.

You have an incredibly important task as jurors. It's to determine the facts. You and you alone, not the Court, not anyone else in this courtroom, you and you alone are the sole

judges of the facts. The Constitution itself recognizes your unique role in our system of justice.

So please just pay careful attention to the witnesses and the evidence received at trial, keep an open mind, and you will return a just verdict.

All right. So why don't we proceed with the government's case.

MR. HARTMAN: Your Honor, the government calls Darren Stumberger.

DARREN STUMBERGER,

called as a witness by the Government,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HARTMAN:

THE COURT: You may proceed.

MR. HARTMAN: Thank you, your Honor.

Q. Good morning, Mr. Stumberger.

A. Good morning.

Q. Mr. Stumberger, what do you do for a living?

A. Currently unemployed.

Q. And how long have you been unemployed?

A. Since March 2019.

Q. Prior to March 2019, where were you employed?

A. Live Well Financial.

Q. And during what years did you work at Live Well Financial?

A. 2014 to 2019.
Q. Mr. Stumberger, are you testifying today pursuant to a cooperation agreement with the government?
A. Yes.
Q. As part of that agreement, have you pled guilty to any crimes?
A. Yes.
Q. What crimes have you pled guilty to?
A. Securities fraud, conspiracy to commit securities fraud, bank fraud, wire fraud, conspiracy to commit wire and bank fraud.
Q. Why did you plead guilty to those crimes?
A. I pled guilty because I was engaged in conduct that was wrong, and I accept responsibility.
Q. What did you do to make you guilty of those crimes?
A. I was involved in an effort to defraud banks and receive -- borrowing more than we should have.
Q. Did you do that alone or did you do it with other people?
A. Other people.
Q. Do you see anyone in the courtroom who participated in that conduct with you?
A. Yes.
Q. Who do you see?
A. Michael Hild.
Q. Could you identify Mr. Hild by an article of clothing that

he's wearing.
A. Gray suit.
MR. HARTMAN: May the record reflect that the witness has identified the defendant.
MR. DUSING: No objection.
THE COURT: It shall so reflect.
Can you speak up a little bit. Thank you.
MR. HARTMAN: I'm sorry, Judge.
BY MR. HARTMAN:
Q. Mr. Stumberger, what are your obligations under your cooperation agreement with the government?
A. To tell the truth and to appear when asked.
Q. What do you hope to receive by cooperating?
A. A potential reduction in the sentence.
Q. Mr. Stumberger, how far did you go in school?
A. I received a graduate degree.
Q. In what year did you receive your graduate degree?
A. 2002.
Q. What kind of degree was it?
A. An MBA.
Q. During the time you were working on your MBA, were you also employed?
A. Yes.
Q. Where were you employed?
A. Standard & Poor's.

Q. What is Standard & Poor's?
A. Standard & Poor's is a rating agency.
Q. Can you explain what that means.
A. Sure. A rating agency applies ratings to securities, bonds.
Q. OK. And what's a bond?
A. A bond is debt. It's a financial instrument similar to an IOU, a loan, whereas there is a borrower that wants to raise money, and there's an investor that will provide that money in exchange for a promise it will get pay paid back. And there's interest payments along the way.
Q. And can bonds be bought and sold like stocks?
A. Yes.
Q. Does their value go up and down like stock values?
A. Yes.
Q. Now, you said you were working at Standard & Poor's doing ratings, is that right?
A. That's correct.
Q. How long did you do that work?
A. Approximately two and a half years.
Q. OK. So what year did you leave Standard & Poor's?
A. 2002.
Q. And where did you go?
A. Morgan Stanley.
Q. What were you doing at Morgan Stanley?

A. I worked in the fixed income group, specifically, securitized products, and worked on -- in the finance group and sales and trading.
Q. And when you talk about fixed income, what's fixed income?
A. It's the bonds market.
Q. And you were doing sales and trading. What does that mean?
A. The activities included buying and selling bonds with clients and customers.
Q. OK. Was there a particular type of bond that you were focused on when you were working at Morgan Stanley?
A. Yes.
Q. What kind of bond?
A. Mortgage-backed securities.
Q. Can you explain what a mortgage-backed security is.
A. A mortgage-backed security is a bond, and it's a bond that's created by pooling underlying mortgages of homes, residences.
Q. When you create this bond, what is the debt that is part of the bond?
A. Well, the debt is the total amount of the pool of underlying mortgages.
Q. OK. And what is the benefit to the holder of the bond?
A. The benefit is some amount of return on investment, and the holder of the -- the investor receives periodic interest payments and then an ultimate repayment of principal.

Q. OK. Now, how long did you work at Morgan Stanley?
A. Four years.
Q. Where did you go after that.
A. Goldman Sachs.
Q. What you were doing at Goldman Sachs?
A. My work was similar in nature worked in the securitized products group and focused on the finance piece.
Q. When you say focused on the finance piece, what does that mean?
A. The documentation and acquisition of mortgage loans and the securitization or the pooling of those loans into bonds.

(Continued on next page)

BY MR. HARTMAN:
Q. How long did you do that work at Goldman Sachs?
A. Approximately two years.
Q. What year did you leave Goldman Sachs?
A. 2008.
Q. Where did you go after that?
A. KBC.
Q. What were you doing at KBC Bank?
A. I was at the trading desk buying and selling bonds.
Q. How long were you at KBC?
A. Approximately one year.
Q. And where did you go after that?
A. Bank of America.
Q. What were you doing there?
A. I worked on the trading desk buying and selling mortgage backed securities.
Q. When did you leave Bank of America?
A. 2011.
Q. Where did you go?
A. Knight Kaplan Group.
Q. What is Knight Kaplan Group?
A. Knight Kaplan Group is a public company more focused on stock trading, a fixed income group similar to the previous.
Q. How long were you at Knight Kaplan Group?
A. I was there until 2013.

Q. In 2013 where did you go?
A. Stifel Financial.
Q. What is Stifel Financial?
A. It's an investment bank securities firm like the others but smaller.
Q. You have spoken about these mortgage backed securities. Are there different types of mortgage backed securities?
A. Yes.
Q. And are there different types of mortgage backed securities based on the type of work that are securitized?
A. Yes.
Q. Are you familiar with the concept of HMDS?
A. Yes.
Q. What is an HMDS?
A. HMDS is a mortgage backed security backed by analysts.
Q. What are HECMs?
A. A reverse mortgage.
Q. And what does HECM stand for?
A. Home Equity Conversion Mortgage.
Q. At a high level, what is a reverse mortgage?
A. Reverse mortgage is a mortgage designed for seniors to extract equity from their home so they don't have to pay principal and interest each month.
Q. And were you involved in trading and producing these HECMs when you worked at some of these institutions that you talked

about?
A. Yes.
Q. Are there different types of HECMs?
A. Yes.
Q. What are the different types?
A. Two primary types are fixed rate and adjustable rate.
Q. When you talk about fixed rate versus adjustable rate, what are you referring to there?
A. The underlying mortgage rate on the loan.
Q. So it's either fixed or adjustable?
A. Fixed rate or adjustable rate.
Q. What does that mean in practice?
A. What it means is that when a consumer takes out this loan, reverse mortgage, the mortgage rate on it is either fixed or it's adjustable or as the rate adjusts over time at periodic intervals.
Q. Is that based on reference to some sort of interest rate index?
A. Yes.
Q. Now can HECMs be broken down into different component parts?
A. Yes.
Q. And what are those types?
A. The HECMs can then be structured, and the types of bonds there are interest only, as an example, or interest loan fixed.

Q. You can you explain -- are there different parts of the HECM?
A. Yes.
Q. What are the two different parts? You talked about interest only and principal and interest. First let's talk about principal and interest, what's the concept?
A. The principal and interest bonds receives both principal payments and interest payments.
Q. From the underlying mortgage borrowers?
A. That's correct.
Q. And then the interest only bond, what is that?
A. It just receives interest.
Q. And are those interest only bonds called IOs?
A. IOs, yes.
Q. That stands for interest only?
A. Yes.
Q. When you were working at the institutions like Stifel, were you actively trading these as well?
A. Yes.
Q. Now when you are were working at Stifel, were there other people who worked closely with you trading in securities?
A. Yes.
Q. Who did you work closely with?
A. Richard Boyd, Dan Foster and Ernie Calabrese.
Q. Did any of those people subsequently come to work with you?

A. Yes.
Q. Who of those people?
A. Ernie Calabrese and Dan Foster.
Q. As a trader dealing in these bonds, did you participate in what's called a BWIC process?
A. Yes.
Q. What is a BWIC process?
A. BWIC stands for Bids Won In Competition or Comp. Essentially the holders or investors in these bonds, when they want to sell them, they set an auction to the market to the dealers, specify times, specify date and their requests, bids or prices for the bonds they're selling.
Q. And with respect to these IO bonds that you've talked about, how are the prices of the bids expressed?
A. In a dollar price.
Q. And the price itself, what is that, what kind of number is that?
A. The price is expressed as a percent of the outstanding amount the face value.
Q. So if you bid a bond that has a face value amount say of about $100,000, what kind off bid would you expect to see, just as an illustration concept?
A. 10, 10 cents on the dollar.
Q. So 10 is 10 percent of the face value of 100,000?
A. Correct.

Q. So how much would that translate into what you would pay for the bond?
A. 10,000.
Q. Okay. So 10 percent of the face value.
Now what were the factors that you considered in determining what sorts of bids or prices to offer for the bonds that were being auctioned off?
A. To determine prices you would use modeling software or technology and you load in certain inputs and that's run and a price is generated.
Q. At a high level, what does that matter for making a bid on these type of bonds?
A. The inputs are yield speeds and interest rates.
MR. HARTMAN: And Ms. Troy, could you show, just for the Court and parties, what's been marked for identification as Government Exhibit 1604.
Q. Mr. Stumberger, can you see that?
Is this an illustration of these concepts that will help and explain your testimony?
A. Yes.
Q. And did you participate in preparing this document?
A. Yes.
MR. HARTMAN: The government offers it.
THE COURT: Any objection?
MR. DUSING: Objection, your Honor, the witness is not

offered as an expert, so the objection would be to the extent this is not -- this is work product not entered into evidence and specialized knowledge is not used here.

THE COURT: Do you want to respond? Is this necessary? It's a one-page document.

MR. HARTMAN: Yes, your Honor, it illustrates the concepts.

Judge, I'm happy to address this in open court. The testimony is really with respect to the process Mr. Stumberger followed, so it explains what he did when he was bidding on the instruments.

THE COURT: I'm not going to admit this, but after his testimony if you want to create a demonstrative which includes his testimony defining these concepts --

MR. HARTMAN: That's fine.

BY MR. HARTMAN:

Q. Mr. Stumberger, let's talk about the concepts one by one. You said -- remind us, what are the three concepts?

A. Yields, prepayment speeds, and interest rates.

Q. So let's start with yield. What is the concept of yield?

A. Yield is a measure of the return on the bonds.

Q. So what do you mean by that?

A. What I mean by that is the investor, the holder of the bonds, is buying the bonds to get a return, a yield on it, profit, that's the yield.

Q. And how do you determine the yield when you're trying to determine what to offer for a bond?
A. Yield is determined by the market.
Q. Now you also mentioned prepayment speeds. Can you explain what the concept of prepayment speeds means in connection with these IO bonds?
A. The prepayment speed is a number that reflects the speed in which the underlying mortgages are paying off. So as mortgages are paid off, there's a speed that's associated with that rate of paying off.
Q. And third criterion was interest rates, is that right?
A. That's correct.
Q. And remind us again what the interest rates are and how that affects the value of these bonds.

MR. DUSING: Objection, your Honor.

THE COURT: Why don't we have a sidebar.

(Continued on next page)

(At sidebar)

THE COURT: Is your objection with respect to the expert testimony?

MR. DUSING: It is, your Honor.

MR. HARTMAN: Judge, our view is he's describing what he did when he was about bidding on these bonds. He's describing as a player in this industry. It's essential background, the whole story. He is describing his work. And it becomes relevant to what happens later on. It's not expert testimony, he's a fact witness and he's describing what he did.

THE COURT: Is your position that any of what he is saying is an opinion or something that is controversial in any way in this area?

MR. DUSING: It is, your Honor, to the last question pertaining to valuation of the bonds. That's ground zero in this case. I certainly understand and will try to offer what we lay, since he's going to have to discuss some of these concepts and his particular understanding of them. For purposes of the factual testimony, I have no objection to that, but to the extent that it is given that he's teaching a class here on bonds, it goes too far there. So if attention could be paid specifically to emphasize this is his personal understanding, there would be no objection.

MR. HARTMAN: I'm happy to rephrase that question that way.

THE COURT: Why don't you do that. It's his understanding and it's what he did.

MR. HARTMAN: Sure.

(Continued on next page)

(In open court)

BY MR. HARTMAN:

Q. Mr. Stumberger, the real question I'm asking you about is what assumptions you considered in bidding on these bonds. Do you understand that?

A. Yes.

Q. Are you testifying about your understanding and the assumptions that you considered in bidding on these bonds when you were at Stifel?

A. Yes.

Q. You talked about the concept of yield, you talked about the concept of prepayment speeds. How do you consider the concept of interest rates in determining how to bid on these bonds?

A. The use of the interest rate assumption or input is reported because of adjustable rate mortgages, because when you model or analyze these bonds you have to predict the future because they're adjustable rate. You have to to come up with an interest rate in the future. So if you're involved in cash flows, you need to have an interest rate assumption or predict what is going to happen in the future.

Q. Now when you were bidding on these bonds, how would a change in yield or an expectation of change in yield affect whether your bid price was high or low?

A. The way the yield works is, all else being equal, a higher yield is lower price. So it's an inverse relationship. Lower

yield, higher price.
Q. And when you were making bids on these bonds, how would your expectations about prepayment speeds affect how high or low you would bid?
A. Payment speeds, all else being equal, if you run a faster speed or faster rate in which the underlying mortgage is paying off, that would lower the price.
Q. And then with respect to the interest rates, how would your expectations about interest rates affect your view about whether you should bid higher or lower on these bonds?
A. Depending on the input used on interest rates -- or the effect of interest rates on a portfolio or a bond price is generally the higher the rates, the lower the price, and vice versa, lower the rates, higher the price.
Q. And when you were bidding on these instruments, did you see at what price the bonds would be sold?
A. Yes.
Q. And based on those observations, did you reach any conclusion about whether or not those assumptions were consistent with what other people who were bidding on this understood?
MR. DUSING: Objection, your Honor.
THE COURT: Sustained.
Q. Mr. Stumberger, when you were bidding on these bonds, did you have to consider how others might bid for them?

A. Yes.
Q. How is that?
A. Because as a bidder you were in competition with other similar traders, and if you wanted to win, which was most of the time, you would try to figure out who you were competing against.
Q. Did you consider that in determining what yield assumptions, what prepayment assumptions, what interest rate assumptions to use in formulating your bid?
A. I would say no. My bids were formulated by where I could acquire bonds and then be able to sell into the market.
Q. And how was that consideration, the need to sell the bond into the market, affecting how you considered these factors?
A. It drove everything. My role was to be able to buy bonds and sell them at a higher price. That is the general way to trade.
Q. Now were there circumstances when you worked at Stifel where you were called upon to value the bonds that Stifel owned?
A. Yes.
Q. What were those circumstances?
A. On a daily basis we were required to mark the bonds to market, and if the rate changes in the market you apply the adjustments to the portfolio.
MR. DUSING: Objection, your Honor.

THE COURT: Let's have one more sidebar.

(At sidebar)

THE COURT: Is the objection to who is required to do it?

MR. DUSING: It is, your Honor.

MR. HARTMAN: I can phrase it a different way.

THE COURT: Thanks.

(Continued on next page)

(In open court)

THE COURT: You may proceed.

MR. HARTMAN: Thank you, Judge.

BY MR. HARTMAN:

Q. Mr. Stumberger, as part of your work at Stifel, did you have a practice of engaging in marking a portfolio?

A. Yes.

Q. Could you explain what that means?

A. Sure. On a daily basis my responsibility was to value, mark the bonds to market.

Q. What does that mean?

A. It means I needed to mark the position of all of the bonds in portfolio to a price in which I could sell them.

Q. And you said that was a responsibility. What was your understanding of the source of that responsibility?

A. There were internal compliance rules, procedures at Stifel, but then also with FINRA and other regulatory bodies.

MR. DUSING: Objection, your Honor.

THE COURT: Overruled.

Q. Just one more question on this, Mr. Stumberger, what is FINRA?

A. FINRA is a regulatory body that oversees, supervises the securities industry.

Q. When you worked at Live Well, was Live Well supervised by FINRA?

A. Not to my knowledge.

MR. DUSING: Objection, your Honor.

THE COURT: He's just talking about his knowledge, so I will overrule the objection.

Q. Now Mr. Stumberger, at some point while you were working at Stifel, did you learn that Stifel was exiting the IO space?

A. Yes.

Q. Were you getting any specific instructions by the leadership at Stifel?

A. Yes.

Q. What were you told to do?

A. I was told to exit the portfolio, liquidate the portfolio before leaving the firm.

Q. And what did you do when you were told this?

A. What I did was devise a new business plan in which I approached originators and mortgage lenders in the reverse mortgage industry to essentially move the portfolio from Stifel to the originator mortgage lender and bring a team over as well.

Q. Who were some of the originators who you spoke to about this?

A. Google Financial, American Advisers Group, AAG, were the two I remember.

Q. Who at Live Well Financial did you speak to about this?

A. Michael Hild.

Q. Now did you have discussions with Mr. Hild about how such a move would work to purchase the bond?
A. Yes.
Q. Did you present ideas to him about why it would be a good investment?
A. Yes.
Q. Did you have an understanding based on your conversations with him or others at Live Well about whether Live Well was itself evaluating the wisdom of such transaction?
A. Yes.
Q. And what was your understanding?
A. Two examples were the portfolio was valued at the time at Stifel before its transition to Live Well by several sources, independent pricing services, some of the dealers. I also remember it being a business model that was modeled showing the different components of the business and the expenses, the revenues.
Q. Did you put that all together or did someone else?
A. Someone at Live Well.
Q. Ultimately, did the portfolio get sold to Live Well?
A. Yes.
Q. And do you remember the approximate market value portfolio in Live Well?
MR. DUSING: Objection, your Honor.
Q. What was the first price for the portfolio?

MR. DUSING: Objection withdrawn.

THE COURT: Objection withdrawn. You may answer that.

A. My recollection is it was roughly 45 to 50 million.

Q. Was it at that time that you moved to working at Live Well?

A. Yes.

Q. Can you remind us who came from Stifel to Live Well to work with you?

A. Calabrese and Foster.

Q. Where was Live Well headquartered?

A. Richmond, Virginia.

Q. Did you work in Richmond, Virginia?

A. No.

Q. Where did you work?

A. I had an office in New Jersey.

Q. Did you work there alone or did other people work with you?

A. Ernie worked with me.

Q. Where did Mr. Foster work?

A. Dan worked in Manhattan.

Q. What was your title when you moved to Live Well?

A. Executive vice president.

Q. Did anyone report to you?

A. Dan and Ernie.

Q. And who did you report to?

A. Michael Hild.

Q. At a high level, what were your responsibilities when you

first moved to Live Well?
A. When I first moved to Live Well it was to manage the bond portfolio.
Q. And what did that mean?
A. That meant valuing it, marketing it to market, and just analyzing portfolio.
Q. Did you mark the portfolio to market in context of your work at Live Well?
MR. DUSING: Objection, your Honor.
THE COURT: Basis?
MR. DUSING: Reference to marking it to market and what that is and what that entails.
THE COURT: Overruled.
Q. Mr. Stumberger, why did you mark the portfolio to market at Live Well?
A. Because that's what the industry did. That's normal.
Q. Now you said that you also worked with Mr. Foster and Mr. Calabrese at Live Well. What were their responsibilities?
A. Ernie Calabrese's responsibility was -- primary responsibility was negotiating documents and managing counterparty relationships.
Q. And the counterparties you are referring to are who?
A. Lenders.
Q. When you refer to the lenders, who are you referring to?
A. Referring to the institutions, the banks, the securities

firms than lends money to Live Well.
Q. And did Live Well borrow money to acquire the portfolio from Stifel?
A. Yes.
Q. You said Mr. Foster also worked with you. What were his responsibilities?
A. Dan Foster's primary responsibilities were doing the analytics, the modeling, the analysis on the portfolio, the daily, monthly.
Q. And what was the purpose of doing those analytics?
A. To determine the valuations predominately.
Q. Now at a high level, how did your compensation work when you came to Live Well?
A. My compensation was structured two ways, there was a base salary and there was a quarterly bonus.
Q. And what was the basis for calculating the quarterly bonus?
A. The bonus was calculated by using the amount of the coupon payments from the portfolio. So the interest income from the portfolio.
Q. So these are payments that the bonds are generating through interest payments?
A. That's correct.
Q. Now were you in touch with Mr. Hild in connection with your responsibilities at Live Well?
A. Was I in touch with him?

Q. Yeah, did you communicate with him?
A. Yes.
Q. How, primarily, did you communicate with him?
A. Primarily by phone.
Q. Were there regular phone calls or meetings?
A. Yes.
Q. Can you describe that?
A. Sure, Monday through Thursdays there was a standing 9:30 a.m. call.
Q. Who would typically be on that call?
A. It would be myself, Dan, Ernie, and Michael and Eric Rohr.
Q. Now Mr. Stumberger, you indicated that Live Well had borrowed to purchase the bond portfolio, is that right?
A. That's correct.
Q. And are you familiar with the concept of repo lending or repo financing?
A. I am.
Q. Did Live Well rely on repo financing to purchase the portfolio?
A. Yes.
Q. Can you explain what repo financing is?
A. Sure. Repo stands for repurchase, and it's a repurchase agreement, so it's a type of lending that is offered to entities in collateralized buy assets.
Q. And why is it called a repurchase agreement?

A. It's called a repurchase agreement because it's structured. It's a loan structured as a sale of, in this case, bonds, so selling bonds with an obligation to buy them back, and the bonds were the collateral.
Q. When you say obligation to buy them back, whose obligation is it in this case?
A. It would be Live Well's.
Q. And you said it's a collateralized loan. Can you explain your understanding of what that term was?
A. Sure. So it's security. It's something that is backing the loan. As an example, if I took $100 loan, and for the loan they asked for my iPhone in exchange for that, I couldn't get the loan without handing over my phone. So it's something that is backing the loan, and to extent that the borrower defaults, he would be able to have that and sell it and pay off the loan.
Q. What does default mean?
A. Not fulfilling obligations.
Q. Now with respect to these repo loans, you said that they were structured as a sale of securities, is that right?
A. Correct.
Q. Were there negotiation of the price at which -- I'm asking you specifically with respect to Live Well's arrangements, was there negotiation over the price at which lenders would purchase the -- advance cash on the bonds?
MR. DUSING: Objection, your Honor, foundation.

THE COURT: Were you a party to any negotiations of that sort?

THE WITNESS: No.

Q. Were you familiar with the structure of these arrangements based on your work at Live Well?

A. Yes.

Q. Did you review documents that set forth the way these arrangements would work when you were working at Live Well?

A. Yes.

Q. Did you have conversations with Mr. Hild about the way the arrangements would work?

A. Either myself or Ernie, Eric.

Q. Were you a party to conversations about this?

A. Yes.

Q. So Mr. Stumberger, let me ask you again, did you have an understanding about whether in these repurchase arrangements there was negotiation of the price or the amount to be lent or was this dictated by some other source?

A. It was dictated by or specified in the agreement the market value by an independent third party.

Q. And was that true of all the repo lenders or just some of them?

A. Some of them.

MR. DUSING: Objection, your Honor, foundation.

THE COURT: What's the basis of your knowledge that

led you to just answer as you did?

THE WITNESS: There was a defined term in the agreement between Live Well and the repo lenders, it being price, which is the exact defined term, but it was a definition on the pricing which the transaction would occur.

THE COURT: Overruled.

Q. Mr. Stumberger, the question I asked was: Was this use of a third-party pricing source specific to particular repo lenders?

A. Yes.

Q. Were there any repo lenders that Live Well did not use a third-party source?

A. Yes.

Q. Which lenders?

A. Nomura.

Q. Okay. And in connection with Live Well borrowing from Nomura, how was the price that was used for the loan amount calculated?

A. Their trading desk would determine the prices based on the market.

Q. Now typically would the repo lenders lend the full amount or the full value of the bond?

MR. DUSING: Objection, foundation.

THE COURT: Do you want to ask an additional question?

MR. HARTMAN: I could try to lay a foundation more

generally, Judge.
Q. Mr. Stumberger, in connection with your work on the trading desk and the calls that you had with Mr. Hild four days week, did you talk about the relationships between Live Well and the repo lenders?
A. Yes.
Q. Was that something that was fundamental to the work that you were doing?
A. Yes.
Q. Did you talk about it very frequently?
A. Yes.
Q. Did you have an understanding of particular repo lenders and particular arrangements between Live Well and those repo lenders?
A. Yes.
Q. Did Mr. Hild discuss those issues with you on these calls?
A. Yes.
Q. So based on that, did you have an understanding about which repo lenders would rely on this third-party price and which of ones used their own valuations?
A. Yes.
Q. Which ones used their own valuations?
A. Nomura is the one I remember.
Q. Now in connection with your work at the trading desk and your conversations about these repo arrangements, did the

concept of a haircut get discussed?
A. Yes.
Q. What is a haircut?
A. A haircut is the amount between how much the lenders would lend and the market value of the bonds.
Q. And what was your understanding about why the lenders applied a haircut to their lending?
A. The lenders got a haircut because in the event of a default, like I mentioned previously, the lender would then own the securities and typically sell the securities to repay the loan. And the haircut was a push. So if there was market volatility, they had a push against where they sold the bonds and paying off the loan.
Q. So typically would the lenders lend more or less than what they understood was the value of the bond?
A. Less.
Q. Are you also familiar from your work and your discussions with Mr. Hild and others with the concept of a credit limit?
A. Yes.
Q. Was that something that you discussed with Mr. Hild and others during your work at Live Well?
A. Yes.
Q. What is a credit limit?
A. A credit limit is the maximum amount that the lender would lend. So they come up with a predetermined maximum amount,

that's the credit loan.
Q. And how is that related to this concept of a haircut or the IO collateral?
A. So the value of the collateral at some point will, if there's -- the credit limit will be higher than the amount of the collateral. For example, if there's more acquisition and more bonds added, at some point they reach the limit.
Q. So the lending limit is sort of a cap on how much a lender will lend?
A. That's correct.
Q. Now you indicated earlier that some of the repo lenders relied a third-party pricing source, is that right?
A. Yes.
Q. What was the name of that pricing source?
A. Interactive Data Corporation.
Q. Did you have an understanding, based on your participation in these transactions, about why those lenders rely on a third-party pricing source?
A. Sure. Yes.
Q. Can you explain your understanding?
A. The theory is that the lender wants an independent, unbiased view on valuations.
Q. And what is your understanding about why that was important?
A. Because they wanted independent, unbiased and not the

lender or the borrower determining the prices.

MR. DUSING: Objection, your Honor, to the third parties wanted.

THE COURT: Overruled. I am allowing it in.

This is not expert testimony, this is your understanding of the business that you were working in and how it informed what you did, is that fair to say?

THE WITNESS: Yes.

THE COURT: You may proceed.

MR. HARTMAN: Thank you, Judge.

BY MR. HARTMAN:

Q. Now Mr. Stumberger, when you moved to Live Well Financial, through your work did you develop an understanding about how IDC or the third-party pricing source was formulating the values that it provided for these bonds?

A. Yes.

Q. So initially, what was your understanding about how they were doing that?

A. So initially IDC was receiving the valuations and prices from Live Well.

Q. Did you have an understanding about why that was?

A. Yes.

Q. Why was that?

A. At the time IDC didn't have the capability to come up with the valuations themselves.

Q. And did you have an understanding when you started there this would be something that would be permanent or temporary?
A. Yes.
Q. What was your understanding?
A. It was temporary.
Q. And why was it temporary?
A. Because IDC was -- once we had conversations about the portfolio moving over, they initially requested Live Well supply the bond valuation of the prices, but they would undertake an effort to create their own abilities to do it.
Q. Now initially when Live Well was applying bond prices or values to IDC, were those prices consistent with where you believed you could sell the bonds?
A. Yes.
Q. Now at some point did Live Well cease to provide prices or values to IDC?
A. Yes.
Q. What happened?
A. My recollection was IDC announced that they had the ability now to create the valuations, model the bonds, and that was really 2015.
Q. Okay. And thereafter did IDC begin modeling the bonds itself?
A. Yes.
MR. DUSING: Objection, your Honor, foundation.

THE COURT: Why don't you ask foundational questions.
Q. Ms. Stumberger, are these understandings based on conversations with folks at IDC?
A. Yes.
Q. And was it your understanding that at a certain point IDC was no longer relying on its own valuations but was instead modeling these bonds itself?
A. Yes.
Q. Was that based on conversations with people at IDC?
A. Yes.
Q. Did you convey that to Mr. Hild?
A. Yes.
Q. Now Mr. Stumberger, from your perspective working at Live Well, was there any problem with the way that IDC was modeling these bonds?
A. Yes.
Q. Can you explain what the problem was?
A. Sure. My recollection was IDC was running the portfolio evaluations daily, and when they were doing it, it was causing a daily decline in the bond prices.
Q. And why was that an issue, as far as you were concerned?
A. The issue related to the lenders. So what happens is when the valuations go down, it would trigger a margin call.
Q. Can you explain what a margin call is?
A. Sure. A margin call is a mechanism that's part of the

structure of the lenders in which, after they lend money, the value of the collateral, the value of the bonds is valued thereafter. So what happens is if the value of the collateral goes down, the bonds went down, the lenders would require cash to offset that decline.

Q. Did you have an understanding about why this was a feature of these lending arrangements?

A. Yes.

Q. What was your understanding?

A. My understanding was that the lenders always wanted to maintain a relationship between buying the collateral and the amount of lending.

Q. What do you mean by maintain a relationship?

A. So typically lenders here would lend 70, 80, 85 percent of the value of the collateral. And again, that other piece, the 10, 15, 20 percent was the haircut. So when the value of the collateral goes down, they're less collateralized, less secured.

Q. How does the margin call address that issue?

A. The margin call addresses that issue by requiring the borrower, in this case Live Well, to provide cash to repay some of the loan because the value of the collateral went down.

Q. Do margin calls work both ways?

A. They do.

Q. Can you explain the concept of a reverse margin call?

A. Sure. That would be the opposite. So if the value of the collateral went up or increased, then the borrower could then request cash from the lender.
Q. Would that increase the value or the amount of the principal as well?
A. Yes.
Q. And did Live Well have a right to reverse margin call its repo?
A. Yes.
Q. Now you said that the fluctuations in IDC's valuation for the bonds was creating margin calls for Live Well, is that right?
A. Yes.
Q. Did you discuss that issue with Mr. Hild?
A. Yes.
Q. And what was his reaction?
A. It was one of frustration. For a period of time we were trying to figure out what was going on, but it was a problem.
Q. And why was it a problem?
A. It was a problem because it was requiring Live Well to routinely send cash to the lenders because the value of the bond was declining day over day.
Q. Did you have or did you receive any instructions or direction from Mr. Hild about how to address this problem?
A. Yes.

Q. What were you told to do?
A. I was directed to set up a call with IDC and members of my team and to rectify this problem.
Q. And did you do that?
A. I did.
Q. And what was the outcome of that call?
A. The outcome of the call was IDC ceased modeling the bonds themselves from the prices and requested that Live Well deliver their prices.

MR. HARTMAN: Could we show just for the witness, the Court and the parties what's been marked for identification as Government Exhibit 104. And I will note for the record there's an authenticity stipulation related to this series of exhibits, it's Government Exhibit 2001, so we can offer that at this time as well as Government Exhibit 104.

MR. DUSING: No objection, your Honor.

THE COURT: Admitted.

(Government's Exhibits 104 and 2001 received in evidence)

MR. HARTMAN: So your Honor, we can publish Government Exhibit 104 for the jury?

THE COURT: Yes.

MR. HARTMAN: Ms. Troy, could you put that up?

Q. Mr. Stumberger, this is an email from -- whose email address is this?

A. Email from myself.
Q. And who is it going to?
A. Michael Hild and Eric Rohr.
Q. I don't know if you talked -- I think you mentioned Mr. Rohr earlier, but could you remind us who he is?
A. He was the chief financial officer at Live Well.
Q. There's a CC line here, HECMTrading@livewellfinancial.com. What is that?
A. It was a group email consisting of myself, Ernie, Dan and Eric.
Q. And the date of this email is February 12, 2015. I'm just going to read it and ask some questions about it.

It says: We just had an all hands on call with IDC. This issue is solved and they were able to get their heads around our rationale with the leader of group, Chris Krupa. We will be supplying prices daily to IDC and IDC will use these. This is IDC's broker quote option. They will use the prices verbatim and not model these bonds until we are interested in them doing so.

Mr. Stumberger, what are you communicating to Mr. Rohr here?
A. I'm communicating the result of the outcome of the call we had with IDC.
Q. Is that what you testified about earlier before this email?
A. Yes.

Q. The next paragraph says: On remittance day and Intex update day we will have an internal call with Eric to decide what we feel is appropriate to adjust on the position. We will then rope in Michael and propose our thoughts/rationale.

So first of all, Mr. Stumberger, what is remittance day?

A. Remittance day is one day of the month where, in this case, Live Well will receive the cash payments from the portfolio and also report on the new face value of the outstanding loan.

Q. Why was that relevant to IDC pricing, from your perspective?

A. Because for the model or value of the bond we needed to know the current balance or what's comprised in the portfolio.

Q. Did that change?

A. It did.

Q. You say we will have internal call with Eric. Is that Mr. Rohr?

A. Yes.

Q. To decide what we feel is appropriate to adjust on the position. What are you describing here?

A. What I'm describing here is at the time my team, we would, on a monthly basis, value the portfolio based on market adjustments what was needed, and that's what I'm saying here, we would adjust our position.

Q. And you say what you feel is appropriate. Then you say:

We'll then rope in Michael and propose our thoughts/rationale.
Why are you saying that?
A. That was the operating procedure. So at this time we would come up with our thoughts on portfolio valuation and then present it to Michael.
Q. Why would you present it to Mr. Hild?
A. That was the way it was done.
Q. Who had the ultimate decision making authority about what values to assign the bond?
A. Michael.
Q. Did you need his approval before submitting prices to IDC?
A. Yes.
Q. When you were working at Stifel, did you have to get approval for the marks that you used to mark your portfolio to market?
A. No.
Q. Was that entirely your decision?
A. Yes.
MR. HARTMAN: Ms. Troy, you can take that down. And let's show just for the Court, the witness and the parties what has been marked for identification as Government Exhibit 105.
The government offers Exhibit 105?
THE COURT: Any objection?
MR. DUSING: No objection, your Honor.
THE COURT: It will be admitted.

(Government's Exhibit 105 received in evidence)

MR. HARTMAN: Ms. Troy, if you could put that up, please.

Ms. Troy, could you zoom in on Mr. Stumberger's email at 11:40 a.m. at the bottom, please.

BY MR. HARTMAN:

Q. So Mr. Stumberger, in this email you say: For 2, IDC has marked our position down 167K. Is that 167,000?

A. Yes.

Q. In February, or about 14,000 per day on average. The implied margin call amount is 247K which is roughly 1.25 ticks on the entire position. We can mark everything up by 1.25 ticks to erase out the IMC.

Mr. Stumberger, what are you conveying?

A. I am conveying the amounts that IDC had marked down the position as the sum. And with that, there was an implied margin call of a higher amount, and implied means it was -- it could be, it wasn't done, but the lenders could in theory mark the call by that amount. And to reverse that, to make it zero, you could mark up the values by 1.25 ticks.

Q. What is a tick?

A. A tick is 1/32nd of a point.

Q. Why are you presenting this to Mr. Hild?

A. It was asked, possibly in a prior discussion or email, to figure out the implied margin call against the total amount

marking the bonds down.

Q. When you say you can do this, who was going to make the ultimate decision about whether you did do it?

A. Michael.

MR. HARTMAN: And can we look up at the next email, please, Ms. Troy.

Q. Mr. Hild says: That seems appropriate to reverse its decline out, since there is no defensible reason for this daily decline.

MR. HARTMAN: Then we see the next email in the chain, please.

Q. Then, Mr. Stumberger, you send an email saying: Confirmed, IDC marks are up 250,000 today for tomorrow's distribution.

A. Yes.

Q. What are you telling Mr. Hild here?

A. That the marks that were -- the valuations of the marks prices that were raised were submitted to IDC and it would be published the next day.

Q. And Mr. Hild says: Well, that was easy.

A. Yes.

MR. HARTMAN: Ms. Troy, you can take that down.

Q. Now Mr. Stumberger, when Live Well began submitting pricing for these bonds again in February, was Live Well doing it in the context of where it thought it could sell those bonds?

A. Yes.

Q. Did Mr. Hild ever ask you to demonstrate that you could in fact sell the bonds at these prices?
A. Yes.
Q. Can you describe that conversation, what happened?
A. Sure. My recollection is several months after myself and team joined Live Well we were directed to sell bonds to the portfolio as proof of concept.
Q. Can you explain what that means?
A. Proof of concept, since validation bond are valued to market, if needed to exit or sell a position we could.
Q. And did you do that?
A. Yes.
Q. And what was your understanding about why Mr. Hild wanted to know that?
A. It was my general understanding that he and others wanted validation that the portfolio was valued correctly.
Q. Now Mr. Stumberger, we saw in that email, Government Exhibit 104, that you proposed that at the end of each month or after a check-up day you would put together recommendations for Mr. Rohr and then present those recommendations to Mr. Hild. Is that how things worked in practice?
A. Yes.
Q. At some point did that change?
A. The general way didn't change.
Q. Did you receive direction about what types of

recommendations you should present to Mr. Hild and Mr. Rohr?
A. Yes.
Q. And can you describe that?
A. Sure. So over time my team would run the valuations based on what we thought the market was, and on submitting that to either Eric and Michael, they would propose additional scenarios or sets of inputs to run in addition to what we would run.
Q. Did they consult with you before asking you to run those additional scenarios or just give you instructions to run?
A. Most of the time it was just direction.
MR. HARTMAN: Let's look at an example of this. Could we see, just for the witness, the parties and the Court, what has been marked for identification as Government Exhibit 110.
The government offers Government Exhibit 110.
MR. DUSING: No objection.
THE COURT: All of the exhibits that are pursuant to stipulation, just let me know that.
MR. HARTMAN: I'm sorry, Judge.
THE COURT: Thank you. But it will be admitted.
(Government's Exhibit 110 received in evidence)
MR. HARTMAN: Thank you, Judge. I will note there are authenticity stipulations for all the exhibits I will be mentioning today. There may be objections to individual exhibits.

THE COURT: All right. Please continue to lay that foundation.

MR. HARTMAN: Thank you, Judge.

So could we publish this to the jury, please.

Ms. Troy, could we look at the bottom of this email first.

Q. Mr. Rohr sent an email saying: I thought you were also going to run multiple prepaid scenarios as you did last month.

Mr. Stumberger, what did you understand him to mean by that?

A. So Eric was asking --

THE COURT: Just a minute.

MR. DUSING: Objection, foundation.

THE COURT: Sorry. Hold on one second.

Why don't you lay the foundation.

Q. So let's start with the foundation, Mr. Stumberger.

This is an email from Mr. Foster, is that right?

A. Yes.

Q. And it's to Mr. Hild and yourself, is that right?

A. Are we going to the top of the email?

Q. Yes.

A. Yes.

Q. And the date is June 9, 2015, is that right?

A. June 19, yes.

Q. Sorry, June 19.

And then portion of the email below, is it your understanding this was part of an email chain?

A. Yes.

(Pause)

Q. Mr. Stumberger, I want to ask you about the message on June 19 from Mr. Rohr. Did you receive this message, Mr. Stumberger?

A. Yes.

Q. So Mr. Rohr says: I thought you were going to run multiple prepaid scenarios as you did last month.

What did you understand him to mean by that?

A. What I understood is my team presented perhaps one set of valuations at the time, and the prior month included multiple prepaid scenarios, multiple valuations changing just the prepayment speed assumption.

Q. Could you remind us what the prepayment speed assumption is?

A. Sure, the prepayment speed assumption is the rate in which the underlying pool of mortgages is paid off and the bond is paid down.

Q. And remind us again, if prepayment speed is slow, how does that effect the value of the bonds or the price of the bonds?

A. All else being equal, it would raise the valuation.

Q. You respond and you say: We're running them at the slower terminal speed from last month, which is 5.5 CPR, is that

right?
A. Yes.
Q. What does that mean?
A. So the valuation that was run was using the prepayment speed assumption of the prior month, which was 5.5, so that's the prepayment speed.
Q. And Mr. Hild then responds and says: We want to see all the scenarios that were run last month this time as well. Is that right?
A. Yes.
Q. And what did you understand that to mean?
A. That it was being requested that all the scenarios run the prior month were also run in the current month.
Q. Could you read Mr. Foster's response to Mr. Hild, please.
A. Sure. Okay. I will run them. The reason they weren't run is because we didn't think we could justify running them any slower than we were already running from a trading perspective. I will get on it right now.
Q. Okay. Mr. Stumberger, was it your understanding that Mr. Hild wanted to see the scenarios whether or not you and your team thought they were appropriate?
A. Yes.

MR. HARTMAN: Ms. Troy, you can take that down.

And could you please display for the parties and the Court what's been marked for identification as Government

Exhibit 113.

Your Honor, we offer Exhibit 113 pursuant to stipulation.

MR. DUSING: No objection.

THE COURT: It will be admitted.

(Government's Exhibit 113 received in evidence)

MR. HARTMAN: Could you display it for the jury, please, Ms. Troy.

Q. Mr. Stumberger, this is an email from Mr. Foster to Mr. Rohr cc'ing Mr. Hild and that email was served on July 28, 2015. Do you see that?

A. Yes.

Q. There's an attachment here that says month end marks July '15 through July 7, '15 marked proposal packet.

Mr. Stumberger, what is the purpose of this email?

A. The purpose of this email was it contains the month end valuation for the portfolio.

Q. Was this the presentation of the scenarios you had been asked to run?

A. Yes.

MR. HARTMAN: And Ms. Troy, could we see the attachment, please.

I think actually you can show us just the black column on the left-hand side for now.

Q. So Mr. Stumberger, what are looking at here at a high

level?

A. At a high level you have eight different scenarios in which each one would have its own valuation from the portfolio.

MR. DUSING: Objection, your Honor, foundation. I'm not sure if the witness prepared this spreadsheet.

THE COURT: Why don't you ask a few background questions to get a sense of what we're looking at.

Q. Mr. Stumberger, we looked at the cover email. Did you receive this email?

A. Yes.

Q. Did you receive charts like this regularly in the course of your work at Live Well?

A. Yes.

Q. And did you -- were you called on to interpret them and discuss them with Mr. Hild and others while you were working at Live Well?

A. Yes.

Q. Okay. Mr. Stumberger, just focusing on the bottom portion here, there's eight scenarios and some numbers next to that. At a high level, what's being shown here?

A. So for each scenario it's describing the inputs described previously. So these are different prepayment speed assumptions for each one, and then yield assumptions for each one. So prepayment speeds and yields are the two assumptions that are the variables here in the eight scenarios.

Q. OK. Then on the top part, Scenarios 1 through 8 are also listed. I want to ask you in particular about the last column, which says, "Total MTM."

What is being shown there?

A. The total MTM, MTM stands for mark to market. That would be -- that's showing the change in the portfolio valuation, expresses a change from the prior month.

Q. Is that based on each of these scenarios?

A. Yes.

Q. Break that down. If you submitted Scenario 1, what would that mean in terms of the mark to market?

A. That would mean that the bond portfolio valuation dropped by $536,006 versus the prior month.

Q. If you submitted Scenario 2 to IDC, what would that mean for Live Well's portfolio value?

A. That the change month over month was negative $921,042.

Q. And Scenario 4 has a positive number there, is that right?

A. Yes.

Q. And what does that mean?

A. That meant the valuation based on that scenario went up by $225,442.

Q. For Scenario 5, what would be the effect of submitting Scenario 5 based on this chart?

A. That the value of the portfolio went up by 2.274 million.

Q. OK. Mr. Stumberger, when you worked at Stifel, was

calculating an impact on a change in marks on the value of the portfolio part of your decision making in determining what marks to submit or what marks to use for mark to market?
A. No.
Q. Did you model or look at the impact of pricing assumptions on Stifel's financial position in determining what marks to use?
A. No.
MR. DUSING: Objection, your Honor. I believe the word is Stifel.
MR. HARTMAN: Stifel?
MR. DUSING: Yes.
MR. HARTMAN: I think I said Stifel.
MR. DUSING: You did? Sorry.
BY MR. HARTMAN:
Q. Have you also worked at other places besides Stifel where you engaged in the mark to market practice?
A. Yes.
MR. DUSING: Objection, your Honor.
THE COURT: What is the objection?
MR. DUSING: To be clear this is his understanding of the market, not --
THE COURT: Yes. We are just focusing again on your understanding of the market. This is not expert testimony, but this is your understanding about what you did day to day, is

that fair to say?

THE WITNESS: Yes.

THE COURT: You may proceed.

THE WITNESS: Mr. Stumberger, just to be clear, I am really just asking you about the process by which you came up with marks and submitted them when you were working at Stifel and these other financial institutions.

When you were working at other financial institutions was modeling out the effect of a set of assumptions on the value of the bond or the total portfolio value, was that something you considered at these other financial institutions?

A. No.

Q. Who directed that analysis at Live Well?

A. Michael. At times, Eric.

Q. Who would be the ultimate decision maker with respect to which of these scenarios would be submitted to IDC and ultimately the lenders?

A. Michael.

Q. Did you notice any pattern with respect to which scenarios Mr. Hild chose to submit?

A. Yes.

Q. What pattern did you notice?

A. The pattern I noticed was choosing the scenario that was run that created the mark to market gain or it being flat.

Q. Which of these scenarios is consistent with that pattern,

or would be consistent with that pattern?
A. Scenario 4 and Scenario 5.
Q. OK. Let's look at --
MR. HARTMAN: We can take that down, Ms. Troy. Can you display just for the witness the Court and the parties what's been marked for identification as Government Exhibit 114.
BY MR. HARTMAN:
Q. Mr. Stumberger, is this an e-mail chain that ends with an e-mail from Mr. Hild to yourself and others on July 28, 2015?
A. Yes.
MR. HARTMAN: OK. And your Honor the government offers Government Exhibit 114 pursuant to the stipulation.
MR. DUSING: No objection.
THE COURT: All right. It will be admitted.
(Government Exhibit 114 received in evidence)
MR. HARTMAN: OK. Ms. Troy, you can put that up.
BY MR. HARTMAN:
Q. So, Mr. Stumberger, this is an e-mail on July 28, 2015. Is this from the same month as the scenarios that we just looked at?
A. Yes.
Q. In the middle section here Mr. Rohr says, given a time crunch, go with Scenario 4. Which of the scenarios that we looked in the previous page was that?

A. It was the fourth one.
Q. OK. What effect did Scenario 4 have on the market value of the portfolio, just roughly?
A. 225,000.
Q. Positive or negative?
A. Positive.
Q. OK. And then Mr. Rohr then sends a further e-mail at 12:33 p.m. saying, "Dan, please confirm that this has been loaded to IDC."
Do you see that?
A. Yes.
Q. And then Mr. Hild sends an e-mail. He says, "Dan, are you going to be able to submit to IDC today shows and marks for tomorrow a.m.? This is what we need. Please make sure that happens."
So what do you understand him to be asking Mr. Foster here?
A. Michael is asking Dan to confirm or make sure that the prices could be submitted to IDC so the marks were published by IDC the following day.
Q. OK. Now, at some point --
MR. HARTMAN: Can you take that down, Ms. Troy.
BY MR. HARTMAN:
Q. Now at some point, Mr. Stumberger, did Live Well fundamentally change the way that it was calculating bond

prices for submission to IDC?
A. Yes.
Q. About when did that occur?
A. September 2015.
Q. What prompted that change?
MR. DUSING: Objection, your Honor. Foundation.
THE COURT: Why don't you lay the foundation.
MR. HARTMAN: Sure.
BY MR. HARTMAN:
Q. Did you discuss this change with Mr. Hild and other people?
A. Yes.
Q. And did you participate in the deliberative process about deciding whether or not to change the way in which Live Well valued its portfolio and submitted marks to IDC?
A. Yes.
Q. Let me ask you, why was there a change?
A. There was a change -- there was a change that was a result of several days to weeks of conversations about the valuation.
Q. And what prompted those conversations?
A. What prompted those conversations were the month-end valuations in August, the prior month, and what had happened to the portfolio.
Q. Can you tell us more about that. What had happened to the portfolio at month end August?
A. My recollection was there was a degradation or pretty steep

declines in the valuations.
Q. The valuations that were declining, what were those valuations based on?
A. That current month's inputs, rough and market-based inputs.
Q. Now, you talked about the fact that you were part of conversations about changing the way that Live Well valued these bonds.
Was Mr. Hild part of these conversations?
A. Yes.
Q. What was the practical consequence for Live Well of the fact that the August month-end value declined?
A. The consequence that -- that it would lead to margin calls.
Q. From Live Well's standpoint, what did the margin calls mean?
A. Sending cash back to the lenders.
Q. Was that a problem for Live Well, based on your conversations with Mr. Hild and others?
A. It was.
Q. Why?
A. I don't know the exact reason why, other than it was never preferred to send cash to the lenders.
Q. Now, you said there was a discussion about changing the valuation of the portfolio or the way the portfolio was valued. Can you just tell us at a high level what that discussion was about.

A. The discussion, my recollection, was related to a component of the bond valuation related to seasoning and the yield input effect on the portfolio.

Q. So break that down a little bit. What is seasoning?

A. Seasoning is, it reflects the fact that the bond portfolio as it is aging -- so there's the -- a bond will be brand new at origination, and then ultimately pay down to zero. So it's the -- it describes the length of time during that process.

Q. And how in these conversations with Mr. Hild was that issue, that fact of seasoning, related to the conversations you were having about what yield assumptions to use?

A. My recollection was an issue related to how the bonds were modeled or valued in that when these bonds were marked to market the yield at origination was kept static for lengthy periods of time as the bond was seasoning or moving down the maturity spectrum. Why that's important is because, as a bond pays down, theoretically the yield should go down too.

So what I mean by that is a two-year bond typically has a lower yield than a ten-year bond, and that's typically how it works. The longer the time horizon, the longer the cash is lent, it requires a higher yield.

Q. Mr. Stumberger, are you summarizing conversations that you had with Mr. Hild? Are these facts you discussed with him?

MR. DUSING: Objection, your Honor. He's testifying about his understanding of things.

THE COURT: Are you testifying about your understanding?

THE WITNESS: Yes.

BY MR. HARTMAN:

Q. I want to just clarify that, because I guess my question, Mr. Stumberger, are these things that you were discussing with Mr. Hild at this time?

A. Yes.

Q. So these are concepts that you two were talking about, is that right?

A. And the group, yes.

Q. You described this idea that typically with a bond the yield is higher at origination. Does that mean when the bond is new?

A. When the bond is new.

Q. And lower toward the end of the bond, is that right?

A. Correct.

MR. DUSING: Objection, leading.

THE COURT: OK. Yes, just watch the leading. I will allow it this time.

MR. HARTMAN: OK.

BY MR. HARTMAN:

Q. Now, Mr. Stumberger, was that something did you discussed with Mr. Hild?

A. The context of that discussion, yes.

Q. Did you discuss with Mr. Hild whether the market for HECM IOs was following those same sorts of assumptions about yield?

A. Yes, with regards to the yield staying static or constant for periods of time.

Q. So, what does that mean, that the yield was staying static or constant?

MR. DUSING: Objection, your Honor. What does that mean to this witness?

THE COURT: That's right. It is to this witness, but also what was said to you and your understanding of what was said to you, right?

I think the more you can clarify what specifically was said to you by Mr. Hild that gave you the understanding, that would be helpful. OK?

THE WITNESS: OK.

BY MR. HARTMAN:

Q. OK. So, Mr. Stumberger, in these conversations with Mr. Hild, did you talk to him about your understanding of the way that the market priced these securities?

A. Yes.

Q. Did you tell him your understanding about the way that the market determined the yield to assign to these bonds?

A. Yes.

Q. What did you tell him?

A. The yield -- my recollection was the yield assigned to

valuations were determined by the market, the yield required by investors into the bonds.
Q. What, if anything, did you tell him about whether or not the yield declined over time as the way the market looked at it or remained static?
A. My recollection is that I told him that it was kept static for periods of time.
Q. Did you explain to him how the fact that the yield was kept static affected the price that one of these bonds could command in the marketplace?
A. Yes.
Q. What did you explain to him?
A. That the effect on valuation was overly onerous by doing that.
Q. What do you mean by that? The fact that the yield was static, what does that mean in terms of the valuation of these bonds?
A. Theoretically, the amount of decline was greater than it should be.
Q. The amount of decline in what?
A. In the bond valuation.
Q. Let's break it down into two different things theoretically, and then the way it worked in practice. Did you discuss with Mr. Hild the way it worked in practice?
A. Yes.

Q. What did you tell him about the way the yield assumption worked in practice?

A. My recollection was that it's improper, not sound, that as a bond seasons, matures, the yield requirement should -- theoretically, it wasn't working like that in the market -- should drift down gradually over sometime.

Q. So you told him that's how it should be. Did you also tell him how it in fact worked?

A. Yes.

Q. What did you tell him about that?

A. Basically that the -- that was the way the market was doing it.

Q. What was the way the marketing was doing it?

A. Keeping yield constant not letting it drift down or gradually decrease over time.

Q. You said that the market was penalizing these bonds. Did you explain that to Mr. Hild?

MR. DUSING: Your Honor, objection. Again, if it could be clear it was his view of the market, that would be helpful.

MR. HARTMAN: Judge --

THE COURT: Yes.

MR. HARTMAN: The whole context of this conversation is the conversation that Mr. Stumberger had with Mr. Hild. I am trying to make very clear that I'm asking questions about

what he said to Mr. Hild.

THE COURT: I think it's fair to say what you said and what the response was.

BY MR. HARTMAN:

Q. So that's the question, Mr. Stumberger. Did you explain to him this idea that the market was penalizing these bonds?

A. My recollection was I explained that the way the market was doing it this way, keeping the yield static at new issuance for long periods of time thereafter, was overly onerous to the valuation.

Q. When you say overly onerous to valuation what do you mean by that. Did you explain to him what you meant by that?

A. Yes.

Q. What?

A. What I meant by that was, because of that, the bond valuation decline based on seasoning was greater than it otherwise should be theoretically.

Q. OK. And what did that mean in terms of the price that you could command -- the fact that yield was being kept constant, what did that mean in terms of the price that you could command for one of these bonds in the market?

A. That because that was the market assumption and input and that's the way bonds traded. That would be consistent with where one could sell it.

Q. OK. But did you tell him whether you viewed that as

theoretically appropriate or not?
A. My recollection was I did. That was theoretically not correct or sound, but the market did it that way.
Q. Did you make very clear to him that your understanding was that the market did in fact require this higher yield for these bonds?
A. My recollection was having discussion and talking about to Michael that, not a higher yield, but a yield kept static.
Q. OK. You explained to him that that was in fact how the market did it, is that right?
A. Correct.
Q. Now, we started this discussion by talking about the fact that these conversations led to a change in the methodology that Live Well was using to value these bonds, is that right?
A. Yes.
Q. Who directed that change?
A. Michael.
Q. What was the nature of the change, just at a high level?
A. At a high level, the yield input was lowered dramatically from where it had been.
Q. What did that mean for the value of the bonds that was being submitted into IDC?
A. The effect of dropping the yields dramatically was a large increase in the prices or the valuation of the portfolio.
Q. Now, this methodology that you were using to value these

bonds, did you discuss with Mr. Hild whether or not it was a methodology that was followed by the market for these bonds?
A. Yes.
Q. What did you tell him?
A. My recollection in the discussions was the market, by lowering the yield that dramatically, it would be a departure or a break from where the market how the market was doing it.
Q. So the prices that result from this new methodology, how would they compare to market prices?
A. They were higher.
Q. And did you tell Mr. Hild that?
A. Yes.
Q. Did this new methodology have a name?
A. It did.
Q. What was it called?
A. Scenario 14.
Q. Now, after Scenario 14 was developed, did Mr. Hild direct you to do anything with these new valuations?
A. Yes.
Q. What did he direct you to do?
A. To submit them to IDC.
Q. How did you feel about the decision to submit these prices to IDC?
A. I was concerned. I was nervous.
Q. You said this was done at whose direction?

A. Michael's.
Q. Based on your conversations with Mr. Hild, did you have an understanding about why he wanted these higher prices to be submitted to IDC?
A. Yes.
Q. What was your understanding?
A. That it would create a situation, because of the higher valuations, that Live Well could borrow more money via margin call.
Q. Is this the reverse margin call concept that you were talking about before?
A. Yes.
Q. Can you just remind us what that is.
A. Sure. So when bond valuations go up, the borrower can request cash from the lenders, and that's what happened here.
Q. And did you do anything to document the fact that Mr. Hild directed the submission of these prices to IDC?
A. I did.
Q. What did you do?
A. I began making recordings of conversations.

MR. HARTMAN: OK. Ms. Troy, could we please display for the Court, the parties, and Mr. Stumberger what's been marked for identification as Government Exhibit 402T. I will just note that there is a stipulation that pertains to this exhibit and the accompanying audio exhibits. It's Government

Exhibit 2001 -- I'm sorry, 2009. The prior stipulation was 2001. I may have said that wrong.

So, at this time, we would offer Government Exhibit 2009, the stipulation and Government Exhibit 402T as well as Government Exhibit 402-1 and 402-2, which are the recordings that go with the transcript that's 402T.

MR. DUSING: No objection and no objection and no objection.

THE COURT: All right. Admitted.

(Government Exhibits 2009, 402-1, 402-2, and 402T received in evidence)

MR. HARTMAN: OK. With the Court's permission, can we put that up.

THE COURT: Yes.

MR. HARTMAN: Ms. Troy, you can publish that.

BY MR. HARTMAN:

Q. Mr. Stumberger, this is a transcript.

MR. HARTMAN: Actually, your Honor, Ms. Estes just passed me a note saying might be a good time to break --

THE COURT: Sure.

MR. HARTMAN: -- or we can keep going, Judge, if you want to do that.

THE COURT: Yes. I was thinking we would break around 1:15.

MR. HARTMAN: I think we can probably do this first

one, if you want to do that.

THE COURT: OK. All right.

Raise your land if you feel like you need a break now in the jury or if you can hang on for another 15 minutes.

All right. Why don't we go to 1:15, 1:20. Thank you.

MR. HARTMAN: Thank you, Judge.

Ms. Troy, 402T, is that up for the jury? OK.

BY MR. HARTMAN:

Q. Mr. Stumberger, by stipulation this is a transcript of a conversation that took place on September 9, 2015. The parties to the conversation are Mr. Foster, yourself, Mr. Rohr and Mr. Hild.

Did you record this conversation?

A. It's possible. Others were doing it too. This could be mine.

Q. Was this around the time that you began recording conversations?

A. Yes.

Q. And just situate us, September 9, 2015, where was that in relation to the development of Scenario 14 that you've described?

A. It was right at that time.

MR. HARTMAN: OK. Now, Ms. Troy, could we play the portion of the transcript that begins at line 51, please.

OK. And then I am going ask you to play Government

Exhibit -- actually, let me just note, with the Court's permission, there are binders that were circulated to the jurors that include these transcripts. So, to the extent it's easier to follow along in the binders, they are available. The one thing I would note is they include other transcripts that have not yet been admitted, so --

THE COURT: Don't look ahead, don't peek ahead. Just at the one exhibit we are focused on right now if you are looking at the binders. Thanks.

MR. HARTMAN: Thanks, Judge.

Ms. Troy, could I ask you to play the recording starting at line 51 in transcript. And this is, for the record, is Government Exhibit 402-1, the recording.

(Audio played)

BY MR. HARTMAN:

Q. Mr. Stumberger, were you part of this conversation?

A. Yes.

Q. Mr. Hild, says, "I'm sure as hell not going to flow through 11.4 million in one day."

Do you know what he meant by that, or do you understand what he meant by that based on your participation in the conversation?

A. My understanding is that was the amount of the price valuation increase.

Q. OK. So when you say the price valuation increase, what do

you mean?
A. Applying the Scenario 14 inputs or dropping the yields dramatically, it caused the portfolio valuation to rise by 11.4 million.
Q. He says, "I'm sure as hell not going to flow through 11.4 million in one day."
Do you understand what he means by "flow through"?
A. Yes.
Q. What is your understanding of that?
MR. DUSING: Objection. Objection, your Honor, foundation. Are we going to play this?
THE COURT: I think he's going to play it, but take breaks and ask questions.
Is that right?
MR. HARTMAN: Yes, your Honor.
THE COURT: Overruled.
You can answer that question.
BY MR. HARTMAN:
Q. Go ahead, Mr. Stumberger.
A. Can you repeat the question.
Q. Sure. What did you, when he references flow through, did you have an understanding of what meant by that?
A. Yes.
Q. What did you understand that to mean?
A. My understanding that means, flow through means to submit

these prices to IDC.

Q. OK. And he says, "I'm sure as hell not going to flow through 11.4 million in one day. But, you know, we would need to have a gradual, kind of a gradual glide path."

Did you have an understanding of what he meant by "glide path"?

A. Yes.

Q. What was your understanding of that?

A. My understanding is what that meant is there would be a series of submissions to IDC that would ultimately equate to that 11.4 million number. So, instead of delivering one price submission, there would be several smaller ones that would ultimately get to that number.

Q. Then he says, "So that we don't set off alarm bells all over the place."

Did you have an understanding of what he meant by that?

A. Yes.

Q. What was your understanding?

A. My understanding, that meant this glide path, or series of submissions, would draw less attention to the magnitude of the valuation increase.

Q. Did you have an understanding about whose attention Mr. Hild was concerned about here?

A. Yes.

Q. Whose attention?
A. My understanding it would be the attention of IDC, but then also the lenders.

MR. HARTMAN: OK. Ms. Troy, I think we stopped there. Can you go ahead and play a little more.

(Audio played)

BY MR. HARTMAN:
Q. So, Mr. Stumberger, Mr. Hild references doing a tick a day. I can't remember if I asked you this. What is a tick?
A. A tick is 1/32 of a price.
Q. OK. So what is he proposing here, to your understanding?
A. My understanding was that the values the prices would be raised by one tick a day and submitted.

MR. HARTMAN: OK. Let's go ahead and play, Ms. Troy.

(Audio played)

MR. HARTMAN: Ms. Troy, can you pause right there.

BY MR. HARTMAN:
Q. So, Mr. Stumberger, that's Eric speaking. Just remind us again who Eric is.
A. Eric Rohr was the CFO.
Q. OK. And when Mr. Rohr talks about when, he says, "If the market doesn't recognize it, and you ever have to turn your portfolio, then you're facing a tough nut there."

Did you have an understanding what he was conveying?
A. Yes.

Q. What was your understanding?
A. My understanding was he's explaining that, given this departure with pricing in connection with the market, higher prices versus the market prices, if Live Well ever had to sell bonds or move bonds from one lender to maybe a lender that used market pricing, that would trigger a tough nut, a cash need somehow.
Q. And why is that?
A. Because of the prices not being at market levels.
Q. So, break that down. If you wanted to sell the bond, what would that mean with respect to the relationship with the lender who's lent against the bond?
A. Live Well would have to come up with cash to supplement the sale proceeds to pay off the loan.

MR. HARTMAN: OK. Ms. Troy, you can continue to play.

(Audio played)

Q. Mr. Stumberger, when you said, "It's more" -- this is line 121 -- when you said, "It's more intrinsic value conversation versus, you know, what happens in reality," what did you mean by that?
A. What I meant by that is there's a big difference in pricing for these bonds based on its intrinsic value than where they trade in the market.

MR. HARTMAN: OK.

Your Honor, now might be a good time.

THE COURT: So we are going to take a break now. Just remember, keep an open mind and don't discuss the case.

Thank you.

(Jury not present)

THE COURT: OK. So, first of all, just next time if you can stay in the box until the jury walks out.

THE WITNESS: Sorry.

THE COURT: No worries.

Does it give you enough time for lunch if we meet back at 2?

MR. HARTMAN: Yes. Thank you, Judge.

(Luncheon recess)

(Continued on next page)

AFTERNOON SESSION

(2:00 p.m.)

THE COURT: While we're waiting for the jury, I should let you know Juror 13, who has the family court hearing on Tuesday at noon, we'll give her permission to bring in her laptop and she will do it in a private room here. So we don't have to end for the day, but we need to take lunch early. We could start early or start at the regular time, but I wanted to let you know.

(Continued on next page)

(Jury present)

THE COURT: You may proceed.

MR. HARTMAN: Thank you, Judge.

BY MR. HARTMAN:

Q. Mr. Stumberger, when you were discussing the implementation of scenario 14, did you speak with Mr. Hild about what would be done with the additional cash that would be generated from this margin calling of the lenders?

A. Yes.

Q. And did one of those things relate to expanding the size of the portfolio?

A. Yes.

Q. And can you describe what the plan was?

A. My recollection was applying scenario 14 -- well, scenario 14 could be applied to do bonds purchases, so acquisitions of new bonds.

Q. Okay. And we'll talk about that in a minute. Let's look at a call that relates to this issue, it's actually the same call we were just looking at.

MR. HARTMAN: Ms. Troy, could you please put up 402T again, and let's see the part of the transcript that begins at line 158. And I think this correspond to Government Exhibit 402-2, which is the audio that goes with this.

Ms. Troy, whenever you're ready, let's go ahead and play that.

(Audio recording played)

MR. HARTMAN: I will note for the jurors who are locking at the transcripts in hard copy, the tabs are numbered consistent with the exhibit numbers, so if anybody is looking at the hard copy, this is, for example, 402.

BY MR. HARTMAN:

Q. Mr. Stumberger, you asked Mr. Hild if he wanted to continue to raise debt if we call this cash. What do you mean by calling this cash?

A. What I meant by that was the way I described it earlier, the reverse margin call extracting cash from the lenders.

Q. This is the cash that would be generated by reverse margin calls using scenario 14 pricing?

A. Yes.

Q. Then you refer continuing to raise debt. What is that?

A. My recollection is it was an effort of Live Well to raise debt capital aside from the bonds valuations.

Q. And Mr. Hild, on line 182, we just heard this, he said: I still think we need debt financing to go up, you know, 5, 10, 12 million bucks. Pretty clean in buying IOs.

What is your understanding he was meaning when he said that?

A. My understanding was the debt financing effort was still needed, and the margin call, the reverse margin call, would provide enough cash to buy new bonds, new IOs, on the order of

5, 10, 12 million in market value.

MR. HARTMAN: Let's go ahead and play line 180.

(Audio recording played)

Q. Ms. Stumberger, when Mr. Hild talked about a self-generating money machine, do you have an understanding of what he is talking about there?

A. Yes.

Q. What is your understanding?

A. My understanding is there was an application for the scenario 14 methodology set of inputs whereas it was an ability to purchase new bonds in the market and apply the pricing, the scenario 14 pricing, submit that to IDC, and because the lenders were relying on IDC pricing, they would be lending more money than needed to purchase the bond at the market.

Q. So is the idea that you buy a bond at the market price and then borrow at the higher scenario 14 level?

A. Correct.

MR. DUSING: Objection, your Honor.

THE COURT: What is the basis for the objection?

MR. DUSING: Use of the term "market price."

MR. HARTMAN: I can rephrase the question.

THE COURT: Go ahead.

Q. Mr. Stumberger, is the intent to buy a bond at one price, and applying the scenario 14 would result in a higher borrowing price for the lenders, and then you end up with enough money to

pay for the bond and some for Live Well to keep?
A. Yes, as an example.
MR. HARTMAN: Let's look at an illustration of this.
Could we see, just for the parties and the Court, Government Exhibit 115, and the witness as well.
Q. And at the very top portion of this document, Mr. Stumberger, is this an email from September 15, 2015 from Mr. Foster to Mr. Hild?
A. Yes.
MR. HARTMAN: The government offers Government Exhibit 115.
THE COURT: Any objection?
MR. DUSING: No objection, your Honor.
THE COURT: Admitted.
(Government's Exhibit 115 received in evidence)
MR. HARTMAN: And this is pursuant to the authenticity stipulation.
Ms. Troy, let's publish this for the jury so they could see the header. Then what I want to focus on first is the table, the first table that's a little further down the page, so we could zoom out and zoom in on that, please.
Q. Mr. Stumberger, the table underneath annual IO offerings, what's your understanding of what is being presented on this table?
A. My understanding of this table is it is an illustration of

two new bonds being offered in the marketplace from securities dealers, the dealers being Nomura and Credit Suisse, and it's distributing information about bonds and pricing.
Q. The second bond listed here says the dealer is CS. Do you have an understanding of what CS is here?
A. Yes, Credit Suisse.
Q. Was that a dealer in these securities?
A. Yes.
Q. Now is this a new issuance or is this a seasoned bond or can you tell?
A. They were approximately both new issue.
Q. In the column that says return analytics there's a column that says bid, a column that says scenario 14 price, and a column that says net LWF cash/new mark. Do you see that, Mr. Stumberger?
A. Yes.
Q. Can you explain -- start with the column that says bid, what's your understanding being represented in that bid column?
A. That's bond price. That would be our expectation of where Live Well could purchase the bond from the dealer.
Q. We talked about this in your testimony, but we're now looking at an example of it, so what is this price, how is it being expressed here?
A. It's being expressed in ticks.
Q. So tell us, for example, take the CS bond 12-26. So the

part in front of the dash, what's that?
A. What's the whole number.
Q. And you testified earlier that that's a percentage of the current face value, is that right?
A. Yes.
Q. And then the part after the dash you said is ticks, is that right?
A. Yes.
Q. And remind us what ticks are.
A. One tick is 1/32rd of a percentage point, and this is 26 ticks.
Q. So is the idea this is 12 and 26/32nds percent, is that what is being represented here?
A. Yes.
Q. To calculate the price that you would have to pay if you bid this bond at 12-26, how would you do that?
A. You would multiply that number by the face amount.
Q. And is that the value that's represented in O Face C Face column that's a couple of fields over?
A. Yes.
Q. And there's two numbers there. What are those numbers?
A. That's the original face amount or the original balance of the bonds, then C face is the current amount.
Q. Which of those numbers do you multiply the percentage price by?

A. The current face.
Q. What unit are these face values in?
A. In dollars.
Q. But 97.2, what does that translate to in terms of dollars?
A. 97,200,000.
Q. Now next to the bid price that we looked at earlier is something that says SC 14 price. Do you have an understanding of what is being represented there?
A. Yes.
Q. What is that?
A. That is the price on the bond applying the scenario 14 inputs.
Q. Now the furthest column we looked at before says net LWF cash with new mark, and there's a value there. Just focusing again on the CS bond, what unit is that value being expressed in?
A. Dollars.
Q. And what does net LWF cash mean?
A. That means here is what I described earlier, buying the bonds at the market price for the bid, applying the scenario 14 inputs creating a higher price, and that would be the price in which Live Well would borrow money from lenders to pay for the bonds from the dealer.
Q. Okay. And so the net LWF cash field, what is that representing?

A. That's the excess amount of cash after doing that.
Q. So beyond the purchase price of the bond, is that right?
A. Correct.
Q. Is this, to your understanding, what Mr. Hild was referring to when he was talking about the self-generating money machine?
A. That's my understanding.
MR. DUSING: Objection, foundation.
THE COURT: All right. Do you want to ask further questions to establish foundation?
Q. Mr. Stumberger, we heard a call earlier where Mr. Hild talked about a self-generating money machine. Were you part of that call?
A. Yes.
Q. And what was your understanding of what it was that he was describing as the self-generating money machine?
A. My understanding is what we're looking at here, being able to buy the bond at market, raise their price applying the scenario 14 inputs, and then using the higher valuation for borrowing purposes for the lenders and paying lower amount for the bond at market.
Q. Who gets that $898,000 that's being represented here? Where does that money go?
A. Live Well.
MR. HARTMAN: Ms. Troy, could you zoom out, please, and let's look at the top two emails on this chain.

Q. Mr. Hild says on September 15: Dan, so is the price listed below for the CS bond we bought Friday what was submitted to IDC? If not, please submit the revised price now to make sure IDC has correct pricing.

Mr. Stumberger, what do you understand him to be asking here?

A. My understanding is Mr. Hild is asking Dan if the price, using the scenario 14 inputs, was submitted to IDC for the bond that was just purchased.

Q. And did you have an understanding about why he wanted to know whether that price was submitted to IDC?

MR. DUSING: Objection, your Honor, foundation.

THE COURT: Why don't you ask questions about that.

MR. HARTMAN: Sure.

Q. Mr. Stumberger, you're on this email, is that correct?

A. Yes.

Q. You are receiving this email?

A. Yes.

Q. And why are you receiving this email?

What was your relationship to Mr. Foster?

A. Dan worked for -- Dan was responsible for the analytics and the modeling of the bonds, and we worked together in that effort.

Q. Were you part of conversations about -- I think we saw earlier some emails about which bonds to buy.

A. Correct.
Q. And were you also part of conversations about what the potential markup could be using scenario 14?
A. Yes.
Q. Is this an example of that?
A. Yes.
Q. So do you have an understanding as you sit here about why Mr. Hild was asking whether that price was submitted to IDC?
A. My understanding is that was the new operation, any bonds that were purchased the scenario 14 inputs would be applied to with the higher valuation submitted to IDC, and that's what the lenders lent against.
Q. And Mr. Foster confirms, he says we bought at 12-26 and I submitted at 15-12, is that right?
A. Yes.
Q. So is it your understanding that the modeling that we looked at in the table is what ultimately happened here?
A. Yes.
Q. Mr. Stumberger, were the prices that Live Well paid for these bonds public knowledge?
A. Not to my knowledge.
Q. Did you have an understanding of whether or not the repo lenders were aware of the prices that Live Well paid for these bonds?
A. My understanding was they were not.

MR. DUSING: Objection, your Honor, foundation.

THE COURT: Why don't you ask foundational question.

Q. Mr. Stumberger, did you have conversations with Mr. Hild about the issue of whether or not the repo lenders were aware of the prices that Live Well was paying for these bonds?

A. Yes.

Q. And based on those conversations, was there a view expressed among the group about whether the repo lenders were or were not aware of that?

A. Yes, there were conversations.

Q. And what was the understanding that you got from those conversations about whether or not the lenders were or were not aware?

A. It was my understanding they were not aware.

MR. HARTMAN: Let's look at an example of this. Could we see, just for the parties and the Court and Mr. Stumberger, Government Exhibit 404-T, which is a September 14 call.

The government offers Exhibit 404-T and the corresponding IO recording.

THE COURT: Any objection?

MR. DUSING: No objection, your Honor.

THE COURT: They will be admitted.

(Government's Exhibits 404-T and corresponding recording received in evidence)

MR. HARTMAN: Why don't we publish Government

Exhibit 404-T for the jury.

BY MR. HARTMAN:

Q. Mr. Stumberger, this is a call on September 14, 2015. Could you orient us again where this is in terms of the chronology of the implementation of scenario 14?

A. Yes, it was during that time, perhaps the week after.

Q. The email we just looked at was dated September 15, the one about the Credit Suisse bond, is that right?

A. Yes.

Q. So is this the day before that email was sent?

A. Yes.

MR. HARTMAN: Ms. Troy, could I ask you to play the recording beginning at line 29.

Q. Mr. Stumberger, are you on this call?

A. Yes.

Q. What did you understand Mr. Rohr to be describing when he talked about -- well, first of all, he references Wedbush. What's Wedbush?

A. Wedbush was a securities dealer and one of the repo lenders.

Q. Did Wedbush rely on IDC valuations -- let me ask a different question.

Did you have an understanding -- were you familiar with the terms of the repo arrangement with Wedbush?

A. Yes.

Q. And under the terms of that repo arrangement, what dictated the price that Wedbush used in determining how to lend to Live Well?

A. The price was -- the price of IDC was used for the lending amounts.

Q. So Mr. Rohr here says we're going to have to get the bond on buying marked on IDC. What do you understand him to be saying there?

A. My understanding is he's describing, upon purchasing the new bond, applying the methodology for valuations, submitting it to IDC.

Q. Which methodology are you referring to?

A. Scenario 14.

Q. And he says Wedbush will provide that money to U.S. Bank account. What's the U.S. Bank account?

A. The U.S. Bank account, they were the intermediary, so the custodian, in the industry parlance, would be they control the cash movements.

Q. So the money goes to U.S. Bank and says we'll instruct U.S. Bank to only send a portion of that to, you know, to the extent the purchase price, and then anything left over we can sweep back into whatever account at Live Well.

Mr. Stumberger, what do you understand Mr. Rohr to be describing here?

A. He's describing what we saw on this previous table,

purchasing the bonds from the dealer at one price, applying the scenario 14 inputs, raising the valuations, submitting it to IDC, the lenders, using that higher valuation for lending. And once the cash from the lenders came into U.S. Bank, a portion of which would be used to purchase the bond, and the excess would be swept back or flowed into the fund.

MR. HARTMAN: Ms. Troy, you can continue the recording.

(Audio recording played)

Q. Mr. Stumberger, what did you understand was the problem that Mr. Hild is referring to in line 60?

A. My understanding is there would be a problem if the lenders knew about the lower purchase price versus the price they were lending against.

Q. What is he asking Mr. Foster in the portion of the recording, to your understanding, between line 40 and line 50?

He asks: What does Wedbush see when they go to purchase the bond? Do they see the IDC mark exclusively and nothing else?

What do you understand him to mean by that?

A. My understanding is just that, what price does Wedbush see? Is it just the IDC price or do they see both, the acquisition price and the actual price.

Q. And he says: Do they see what we're buying it for from the seller and therefore they will start questioning how the

difference is between the IDC market and the purchase price, you know?

Did you have an understanding about what he's concerned about there?

MR. DUSING: Objection, your Honor, to the characterization.

THE COURT: Do you want to rephrase that or ask a different foundational question?

MR. HARTMAN: Sorry, I didn't hear the objection.

THE COURT: Do you want to rephrase that and ask foundational questions as to --

MR. HARTMAN: Sure, I can try.

BY MR. HARTMAN:

Q. Mr. Stumberger, you were part of this conversation, is that right?

A. Yes.

Q. And in context of this conversation, Mr. Hild is directing a question to you and your team, is that right?

A. Yes.

Q. And had you and your team considered the issue of what, if any, information about how you purchased these bonds and for what prices you purchased these bonds would be available to the repo lenders?

A. Yes.

Q. And what was your understanding of whether the repo lenders

would see the prices at which Live Well purchased these bonds?
A. Could you repeat that?
Q. Did you have an understanding about whether the lenders would see the prices that Live Well purchased these bonds?
A. Yes.
Q. What was your understanding?
A. My understanding was they did not see the acquisition price.
Q. And Mr. Hild says: Do they see what we're buying from the seller and therefore they will start, you know, questioning kind of how the difference is between the IDC market and the purchase price, you know?
Did you understand from the context of the conversation, given your participation in these events, what he was concerned about?
A. Yes.

(Continued on next page)

Q. What was your understanding of what he was concerned about?
A. My understanding is, if the lender -- in this case, Wedbush -- saw one price in IDC, and they were lending using that price, but then they also saw there was a different price or the price was above the bonds and there was a difference, it would lead to questioning and why is that.
Q. OK. Later in the recording, on line 207 --
MR. HARTMAN: Excuse me. I'm sorry. We can take that down. OK.
BY MR. HARTMAN:
Q. Mr. Stumberger, did you ever share the fact that Live Well was using Scenario 14 to value its portfolio with other dealers in the industry?
A. No.
Q. Did you and Mr. Hild ever have any discussions about whether that was or was not something that you should do?
A. My recollection is yes.
Q. Just at a high level, what was Mr. Hild's view about whether or not that was a good idea?
A. My recollection --
MR. DUSING: Objection. Foundation.
THE COURT: I think if you asked him like what did he say to you and what impression were you left after he said that to you, I think then we will --
MR. HARTMAN: OK. I'm sorry.

BY JUROR:

Q. What did he say to you about whether or not --

MR. HARTMAN: I'll tell you what. Let's just -- can we see, Ms. Troy, just for the parties and for Court what's been marked for identification -- I'm sorry. Actually this is also 404T, starting at line 336. So this is a continuation of the same conversation.

BY MR. HARTMAN:

Q. OK. So Mr. Stumberger, is this later in that same discussion we were just looking at about the self-generating money machine?

A. I'm not --

Q. I'm sorry. About the repo lenders and whether they saw the price?

A. The same recording?

Q. Yes. Is this the same conversation?

A. It appears so.

MR. HARTMAN: So, Ms. Troy, could you please play the recording beginning at line 336.

(Audio played)

MR. HARTMAN: Let's pause right there. Actually, go ahead and keep playing. I'm sorry.

(Audio played)

BY MR. HARTMAN:

Q. Mr. Stumberger, what were you proposing to Mr. Hild?

A. I was proposing me having discussions with the dealers in the market about valuation being the intrinsic value of the bonds being used in its valuation more than what's being done in the market.

Q. OK. And he talks about this concept of a Mack truck and whether it's a good idea to do this. What do you understand that he's telling you there?

A. My understanding of that is, does it make sense to have those conversations in that it was Live Well's thought process that the higher valuations were kind of a secret sauce or proprietary, and why would you want to let that out to the dealer community.

Q. OK. What is he suggesting would happen, at least as you understood, if you let that out dealer community?

A. My understanding is then it wouldn't be, you know, something proprietary to Live Well. Everyone would gravitate towards it, and it would eliminate, it would create more competition for new bonds.

Q. OK. Just to be clear, did this to you make sense -- from your perspective, did this view make sense in the context of the repo lenders?

A. No.

Q. Why not?

A. Because the repo lenders, the repo lenders were requiring a market price for the bonds they lent against.

Q. Were the repo lenders in competition with Live Well to buy bonds?
A. No.
Q. Were the repo lenders investing for their own account in these bonds, to your knowledge?
A. Not to my knowledge.
MR. HARTMAN: You can take that down, Ms. Troy.
BY MR. HARTMAN:
Q. Mr. Stumberger, you did you ever discuss with the repo lenders the fact that Live Well was providing prices to IDC?
A. I'm sorry. Could you repeat that.
Q. Did you ever discuss with the repo lenders, did you ever tell the repo lenders that Live Well was providing the prices that IDC was using?
A. No.
Q. In this Scenario 14 period I am asking specifically about.
A. No.
Q. To your knowledge, did anyone else at Live Well tell the repo lenders that Live Well was supplying these prices in the September 15 and ongoing time period?
A. No.
MR. HARTMAN: Let's look at a call that relates to this.
Ms. Troy, could you please put up just for the parties and the Court Government Exhibit 405T.

The government offers Government Exhibit 405T.

MR. DUSING: No objection.

THE COURT: All right. That will be admitted.

(Government Exhibit 405T received in evidence)

MR. HARTMAN: OK. We also offer the recording associated with this, Government Exhibit 405-1.

MR. DUSING: No objection.

THE COURT: All right.

(Government Exhibit 405-1 received in evidence)

MR. HARTMAN: Ms. Troy, could you put up that for the jury.

BY MR. HARTMAN:

Q. Mr. Stumberger, this is a call on October 5, 2015. Can you just orient us again where is this with respect to the timing and the implementation of Scenario 14?

A. It's approximately one month after.

Q. OK.

MR. HARTMAN: Ms. Troy, why don't you go ahead and play.

(Audio played)

Q. Mr. Stumberger, are you part of this conversation?

A. Yes.

Q. When Mr. Hild referred to Scott, did you have an understanding of who he was referring to?

A. Yes.

Q. Who's Scott?
A. Scott worked at Wedbush.
MR. HARTMAN: OK. And let's go ahead and play a little more.
(Audio played)
MR. HARTMAN: Let's stop right there.
BY MR. HARTMAN:
Q. Mr. Stumberger, did you have an understanding of what Hild meant when he said, "However it goes, it doesn't end well"?
A. Yes.
Q. So just tell us what your understanding was.
A. My understanding is if, in this case Wedbush, if there was a discussion about pricing and the acknowledgment that Live Well has access to IDC, then that would create a big problem.
Q. OK. And is it about Live Well's access to IDC or something else?
MR. DUSING: Objection, your Honor. Leading.
THE COURT: I will allow it. You can answer that.
Q. Maybe I will ask it a different way. When you say access to IDC, what do you mean by that?
A. The problem would be if Wedbush knew Live Well was supplying the prices to IDC.
Q. OK. And is that what would not end well, as you understand it?
A. Yes.

Q. And do you have an understanding about why that wouldn't end well?
A. Yes.
Q. What's your understanding?
A. My understanding is Wedbush in this case required an independent third-party valuation, and there would be the identification that's not what's going on.
Q. And what would the consequences of that be to your understanding for the lending arrangement?
A. There would be a realization that the prices, the valuations that they're lending against are higher than market prices.
Q. What would that mean for Live Well's relationship with Wedbush, to your understanding?
A. My understanding, a couple of things could have happened, one of which would have been a markdown of the prices, triggering a margin call to Live Well. It could have meant the ending of the relationship and Wedbush requesting that the bonds come off the line.

MR. HARTMAN: Ms. Troy, why don't you go ahead and play the rest of this portion.

(Audio played)

MR. HARTMAN: You can stop right there.

OK. You can take that down, Ms. Troy.

BY MR. HARTMAN:

Q. Now, Mr. Stumberger, we talked about the concept of a credit limit earlier. Can you just remind us what that is.
A. Sure. The credit limit is the maximum amount a lender extended to the borrower, in this case Live Well.
Q. Was the credit limit something that you and other people at Live Well had to consider as you were implementing Scenario 14?
A. Yes.
Q. Why was that?
A. It was because, as prices and valuations went higher, that creates the amounts the lender lending goes higher. So the valuations go higher, that means more borrowing, more amount outstanding being lent and that you would reach the credit limit quicker, all else being equal.
Q. And what was the solution to that problem?
A. I'm not sure -- one solution could be finding additional repo lenders that were using IDC as the pricing source.

MR. HARTMAN: OK. Could we see for the parties please and just the Court what's been marked for identification as Government Exhibit 118.

MR. DUSING: I didn't hear. I'm sorry.

MR. HARTMAN: 118.

MR. DUSING: There is no objection by the way, your Honor.

THE COURT: All right.

MR. HARTMAN: So the government offers Government

Exhibit 118.

(Government Exhibit 118 received in evidence)

MR. HARTMAN: Ms. Troy, if you could just zoom in on the top part of the e-mail, please.

BY MR. HARTMAN:

Q. Mr. Stumberger, this is an e-mail from September 24, 2015. So where is this occurring in relation to the implementation of Scenario 14?

A. It was the same month it was implemented.

Q. And it is an e-mail from Mr. Hild to the HECM trading Listserv. Did that include yourself?

A. Yes.

Q. And the subject line is, "Repo."

And the question that's asked is, "Any ideas on what dealers we should approach next for repo who already use IDC? Even if haircuts are greater than 10 percent, we need to start working on this now. The key is using IDC for marks."

Q. Mr. Stumberger, what was your understanding of what Mr. Hild was asking you here?

A. My understanding is it was a request to identify new repo lines that used IDC.

Q. And when Mr. Hild said, "The key is using IDC for marks," did you have an understanding about why he was saying that?

A. Yes.

Q. What was your understanding?

A. My understanding is the Scenario 14 valuations were predicated on the lenders using IDC.

MR. HARTMAN: Ms. Troy, you can take that down.

Let's look at another e-mail just for the parties and for the Court for the moment. Government Exhibit 128, please.

MR. DUSING: No objection, your Honor.

THE COURT: All right.

MR. HARTMAN: I'm sorry, 138.

THE COURT: 138.

MR. DUSING: No objection.

MR. HARTMAN: I'm sorry. It's 128.

MR. DUSING: No objection to either of those.

THE DEPUTY CLERK: 128?

MR. HARTMAN: Yes, it's 128.

So, the government offers 128.

THE COURT: Yes, it will be admitted.

(Government Exhibit 128 received in evidence)

MR. HARTMAN: Thank you. If we could publish that, Ms. Troy.

BY MR. HARTMAN:

Q. Mr. Stumberger, this is an e-mail from Mr. Foster to yourself. It says, "Subject: SC14 - capital charge," and then the body says: "Here are the trades since we've been directed to use SC14 for IDC. Anything over the haircut percentage equals excess cash."

What's SC14, to your understanding?
A. That's Scenario 14.
MR. HARTMAN: And could we see the attachment, please, Ms. Troy. OK. Can we just zoom in on the top portion there. OK.
BY MR. HARTMAN:
Q. Mr. Stumberger, what's being represented here?
A. This is a table of bonds Live Well acquired since it looks like the earlier date is September 11, 2015. So, new acquisitions of bonds and two sets of prices being shown, the acquisition price and the Scenario 14 price and the percent difference.
Q. Where is the percent difference presented here in this table?
A. It's the last column.
Q. OK. That's "Percent Markup," is that right?
A. Yes.
Q. Mr. Stumberger, while we are on the subject, how did the acquisition of new bonds once to the Scenario 14 methodology began affect your personal compensation at Live Well?
A. From a personal standpoint, any acquisitions of new bonds, all else being equal, created additional compensation because it was based off the interest income from the bonds.
Q. OK. So that the idea is as more bonds were producing interest income then your compensation went up?

A. Yes.

MR. HARTMAN: Ms. Troy, you can take that down.

And now, if you could just put up for the parties and for the Court Government Exhibit 413T, please. And at this point the government would offer Government Exhibit 413 and the associated audio recordings.

MR. DUSING: No objection, your Honor.

THE COURT: All right. They will be admitted. Are.

MR. HARTMAN: 413 is the audio.

(Government Exhibits 413 and 413T received in evidence)

MR. HARTMAN: Ms. Troy why don't you publish Government Exhibit 413T, and let's just look at first page here.

BY MR. HARTMAN:

Q. Mr. Stumberger, this is a transcript of a call on March 9, 2016. Can you just orient us again and tell us where this is in relation to when Scenario 14 was initially implemented?

A. Approximately six months after.

MR. HARTMAN: OK. Ms. Troy, why don't we go to line 194. I am going to ask you to play the call beginning there.

(Audio played)

MR. HARTMAN: Let's stop there.

BY MR. HARTMAN:

Q. Mr. Stumberger, what are you talking about here?

A. The discussion here is about attaching a disclaimer to e-mails or embedded somewhere on price submissions to IDC.
Q. Prior to this point in March of 2016, had there been any disclaimer attached to prices submitted to IDC?
A. No.
Q. What kind of disclaimer were you envisioning here?
A. A disclaimer that was used in the market. I think I referenced one of the dealers in this, but something that's used across, you know, different market players that they attach to their e-mails and pricing discussions.
Q. At the time of this conversation in March of 2016, had the markup that we saw associated with Scenario 14 fully flowed through the portfolio?
A. Can you repeat that?
Q. Yes. We saw that Scenario 14 increased the value of the portfolio by $10,000. We saw that earlier. Had that fully been realized by this point?
A. My recollection is yes.
MR. HARTMAN: OK. So why don't we go ahead and play forward, Ms. Troy.
(Audio played)
MR. HARTMAN: Let's stop it right there.
BY MR. HARTMAN:
Q. Mr. Stumberger, earlier in the call you indicated that you wanted to try to bury the disclaimer, and then Mr. Hild comes

back to that issue in the portion we just saw. Why did you indicate that you wanted to bury the disclaimer?

A. The thinking related to that was attach a disclaimer that wasn't overly noticeable.

Q. OK. Noticeable to whom?

A. To in this case IDC.

Q. OK. Did you have an understanding about whether any disclaimer -- why don't you just -- I'm asking about your expectation or your understanding. Did you have an understanding about whether this disclaimer that you are proposing would be transmitted to the lenders by IDC?

A. I didn't have an expectation.

MR. HARTMAN: OK. Let's hear the rest of the recording.

(Audio played)

BY MR. HARTMAN:

Q. Mr. Stumberger, when you had this conversation with Mr. Hild, were you aware that the lenders were a relying on IDC prices to extend their loan to Live Well?

A. Yes.

Q. Was it your understanding that they were relying on those market -- on those prices because they believed they were market price?

A. Yes.

MR. DUSING: Objection, your Honor.

Foundation.

THE COURT: All right. Why don't you ask him a foundational question.

MR. HARTMAN: Sure.

BY MR. HARTMAN:

Q. Mr. Stumberger, you talked earlier about the agreement between Live Well and the lenders, is that right?

A. Yes.

Q. You mentioned there is a defined term, market price, is that right?

A. Yes.

Q. How was market price defined with reference to the lending that the lenders were doing just at a high level?

A. At a high level it was defined as a price that would be determined by an independent, mutually agreeable independent third-party pricing service.

Q. And at this time was that IDC?

THE COURT: Let's just stop.

You are objecting?

MR. DUSING: Objection. Hearsay.

MR. HARTMAN: Judge, it goes to his state of mind and what he's saying here.

THE COURT: This is your understanding of how market price was defined in that context?

THE WITNESS: Yes.

THE COURT: I will allow it.

MR. HARTMAN: So, I think Mr. Stumberger answered the question.

BY MR. HARTMAN:

Q. The last question I just had, the independent third-party service at this time was that, was it your understanding that that was IDC?

A. Yes.

Q. At the time this conversation was happening, Mr. Stumberger, did you know that the prices in IDC were not market prices?

MR. DUSING: Objection.

A. Yes.

MR. DUSING: Hearsay.

THE COURT: I mean, do you want to ask more questions so we don't have an objection every time as to what his basis is for what market price is?

MR. HARTMAN: Sure.

Let me ask it a different way.

BY MR. HARTMAN:

Q. Mr. Stumberger, you initially modeled these bonds before Scenario 14 and then later participated in modeling these bonds after Scenario 14, is that right?

A. Yes.

Q. Was it your understanding that the prices that were being

submitted under Scenario 14 were not prices that were obtainable in the market?

A. Yes.

Q. OK. Did you convey that understanding to Mr. Hild?

A. Yes.

Q. And did you know that at the time you had this conversation with Mr. Hild?

A. Yes.

Q. And I am just asking about what was in your head at the time were you having this conversation. Did you believe that the lenders knew that the marks in IDC were not prices that were obtainable in the market, just in your head?

A. In my head, they did not -- they didn't know that.

MR. HARTMAN: We can take that down.

THE COURT: At some point we should probably take a really short afternoon break. So you tell me when it would be a good time.

MR. HARTMAN: Judge, I have one more e-mail on this, and then it would be a perfecting stopping point.

THE COURT: All right. Good.

MR. HARTMAN: Ms. Troy, can you put up Government Exhibit 138, please, for the parties and for the Court.

MR. DUSING: We have no objection.

THE COURT: OK.

MR. HARTMAN: The government offers Government Exhibit

138.

THE COURT: Admitted.

(Government Exhibit 138 received in evidence)

MR. HARTMAN: Ms. Troy, can you display that.

BY MR. HARTMAN:

Q. Let's look at the header first Mr. Stumberger. This is May 13, 2016, so this is a couple of months after the conversation about the disclaimer that we just looked at?

A. Yes.

Q. In the middle of the page, you say, you send an e-mail --

MR. HARTMAN: Ms. Troy, you don't need to zoom in. I think we can all see this.

BY MR. HARTMAN:

Q. In the middle of the page you send an e-mail to Mr. Hild and others saying, "Does it make sense to take a stab here, send CUSIPs and say they are being priced by Nomura and other brokers quotes slash IDC and see if they jump in or just want to check the box."

The subject line is, "Jeffries wants to see our CUSIPs."

I am not sure CUSIP is a term we've talked about here Mr. Stumberger. What's CUSIP?

A. A CUSIP is a number identifier for a specific bond, so each bond has its own CUSIP.

Q. OK. So that's unique to the bonds that Live Well owned?

A. Yes.
Q. And you talk about Jeffries here. What's Jeffries?
A. Jeffries is one of the securities dealers, so one of the market participants.
Q. OK. And what's the context of this e-mail exchange? What was going on with Jeffries at the time?
A. What was going on here was Jeffries, we were -- Live Well was in discussions about establishing a new lending facility.
Q. And when you say new lending facility, what do you mean by that?
A. A new repo line.
Q. And did Jeffries just act as a repo provider, or did they also transact in the HECM space in other ways?
MR. DUSING: Objection, your Honor. Foundation.
THE COURT: Why don't you ask him the foundational question.
MR. HARTMAN: Sure.
BY MR. HARTMAN:
Q. Mr. Stumberger, were you familiar with Jeffries from your many years working in the HECM space?
A. Yes.
Q. And did you have an understanding about what sorts of business, based on those interactions, Jeffries engaged in with respect to HECM IOs?
A. Yes.

Q. Other than repo, to your understanding, did Jeffries engage in other sorts of business dealings with respect to HECM IOs?
A. Yes.
Q. And what were the nature of those business dealings?
A. Jeffries had its own trading desk. They were active in buying and selling, trading these types of bonds, other types of bonds all within the same sector.
Q. Was that true of all of the repo lenders that Live Well dealt with or just some of them based on your understanding of the industry?
A. Some.
Q. Which particular ones of the ones we have talked about?
A. Other than Jeffries, Nomura.
Q. OK. Any others that you can recall that Live Well borrowed with? Actually, you know what, I'll ask it the other way. Were you familiar with a lender -- we talked about Wedbush, right? Was that one of the lenders that Jeffries, excuse me, that Live Well relied on?
A. Yes.
Q. Was Wedbush active as an issuer of these securities?
A. No.
Q. OK. We've also talked about with respect -- or actually are you familiar with a financial institution called Mizuho?
A. Yes.
Q. And how are you familiar with Mizuho?

A. Mizuho was one of the lenders to Live Well.
Q. OK. Was Mizuho providing repo services to Live Well?
A. Yes.
Q. What about Mirae? Are you familiar with an institution called Mirae?
A. Yes.
Q. How are you familiar with Mirae?
A. Mirae was a repo lender to Live Well.
Q. Are you familiar with the Industrial and Commercial Bank of China?
A. Yes.
Q. How are you familiar with the Industrial and Commercial Bank of China?
A. They were a repo lender to Live Well.
Q. For the lenders we just went through, Wedbush, ICBC, Mirae and Mizuho, were they active in the space of issuing these securities in the same way Jeffries was?
A. No.
Q. OK. Now, you say in the e-mail that we have been looking at Jeffries wants to take a look at our CUSIPs. What was it that Jeffries wanted to do, based on your conversations with Jeffries?
A. These were discussions at the very beginning of the relationship, and Jeffries was asking for the bond portfolio, and they were in the context of doing due diligence on Live

Well.
Q. OK. Were they asking to see just the bonds that Live Well wanted to finance through Jeffries, or were they asking for something else, to your understanding?
A. So my understanding is they were asking for detailed information on the bond portfolio because they -- they wanted to look at the impact to Live Well's financial statements.
Q. OK. So is that the whole bond portfolio as you understand it?
A. Yes.
Q. And you quote a portion in the May 13 -- or the 11:02 a.m. e-mail. You quote, "We'd like to take a closer look given the portfolio's large financial statement impact." Who are you quoting there?
A. I'm quoting the bottom part of this e-mail. So that's from the gentleman at Jeffries.
Q. Why are you raising this issue to Mr. Hild?
A. Because of the request.
Q. What about the request caused you to want to raise this issue with Mr. Hild?
A. That a dealer, an active dealer wanted to information on the portfolio and the pricing.
Q. Why was that something that you felt Mr. Hild needed to know, Mr. Hild needed to know about?
A. Because it was important, and it related to the pricing and

the bonds.
Q. Was there anything about the fact that Jeffries was a dealer in this space that was important to you?
A. Yes.
Q. What was that?
A. There would be potentially quick identification that the prices in which Live Well had its valuations at were a departure from the market.
Q. OK. And Mr. Hild responds to you and says, "I suggest we go radio silent. Nothing good to come of this."
What did you understand him to mean by go radio silent?
A. My understanding is drop the conversation.
Q. With Jeffries?
A. Yes.
Q. When he said nothing good to come of this, did you have an understanding of what he was referring to?
A. My understanding would be that there would be not only potential identification by Jeffries of the prices, but that there could be discussions among Jeffries and others about it.
MR. HARTMAN: OK. Your Honor, now would be a good time to take a break.
THE COURT: So let's just keep the break really short. I know you all probably have to stand and stretch, but we brought a little snack for you. Just remember don't discuss

the case and keep an open mind.

(Jury not present)

THE COURT: All right. I'll see you all in five.

(Recess)

THE COURT: You can be seated.

Just because of COVID, all the jurors can't fit in this jury room, so everything just takes a little longer. So I apologize for that.

About how much longer do you have on direct? Are you going to finish today or not

MR. HARTMAN: Judge, I don't think I will finish today. I may come close, but I think there will probably be a little bit left for tomorrow.

THE COURT: OK.

MR. HARTMAN: Judge, I'm sorry. I didn't really realize how late it is. I think I will have probably an hour tomorrow, just for the Court's understanding.

THE COURT: OK.

(Continued on next page)

(Jury present)

THE COURT: Everyone can be seated. Thank you.

You may proceed.

MR. HARTMAN: Thank you, your Honor.

BY MR. HARTMAN:

Q. Mr. Stumberger, we just looked at that e-mail about Jeffries trying to value the bonds. Do you recall what happened with respect to Jeffries after Mr. Hild told you to go radio silent? Did Jeffries become a repo lender for Live Well?

A. They did not.

Q. At some point did one of Live Well's existing repo lenders ask for information to value one of the bonds that Live Well had?

A. My recollection is one of the lenders asked Live Well for a dealer that was active in the market for that purpose.

Q. Do you remember about when this took place?

A. Yes.

Q. When was it?

A. January 2017.

Q. Which lender was it that raised this request?

A. Wedbush.

MR. HARTMAN: Ms. Troy, could we please display for the parties and the Court Government Exhibit 407T.

The government offers Government Exhibit 407T and the corresponding audio clips.

MR. DUSING: No objection.

THE COURT: All right. They will be admitted.

(Government Exhibit 407T received in evidence)

MR. HARTMAN: I think the two that correspond that we're offering here are 407-1 and 407-2, just for the record.

THE COURT: They will be admitted as well.

(Government Exhibits 407-1 and 407-2 received in evidence)

MR. HARTMAN: So, let's display this for the jury.

BY MR. HARTMAN:

Q. Mr. Stumberger, is this a recording of a conversation that you had with Mr. Hild and others about this request by Wedbush?

A. Yes.

Q. When this call took place, did you know that you were being recorded?

A. No.

Q. OK. Ms. Troy, why don't you go ahead and play from the beginning of the call to line 140 in the transcript.

(Audio played)

MR. HARTMAN: Ms. Troy, why don't you stop it right there?

BY MR. HARTMAN:

Q. Mr. Stumberger, just going up in the transcript, what is going on here? Mr. Rohr says, "Anybody that we could talk to in advance that would be more --"

And you respond, "I think that's risky."

So what did you understand Mr. Rohr to be asking you and what were you explaining to him?

A. My understanding was Eric was asking if there are any dealers whereas Live Well could speak to, to prewire a conversation and be able to have that conversation with Wedbush, because Wedbush was asking Live Well for a dealer to speak to.

Q. When you say prewire the conversation, what do you mean by that?

A. Generally tell the dealer, tell the dealer what is needed to be said for that potential conversation with Wedbush.

Q. OK. And in the context of this issue with respect to Wedbush, what needed to be said from your perspective?

A. From my perspective, it was applying this Scenario 14 methodology or whatever the methodology was at the time to bonds and be able to say it's right. It's market.

Q. OK. And you say, "See what happens."

And Mr. Rohr raises this issue of talking to a dealer in advance.

Based on your understanding and what was in your head when this conversation took place, why would you want to talk to the dealer in advance?

A. Because Wedbush had the intent of checking CUSIPs and a dealer probably would have run it to a market valuation.

MR. DUSING: Your Honor, objection to any speculation. Also, foundation. I believe he has testified he didn't record this call. Could he just tell us who did and who is on the call perhaps.

MR. HARTMAN: I'm sorry I didn't hear.

THE COURT: A couple of points that I think are fair. Number one, just a little bit of foundation, but also a little bit of background. It was noted that he didn't record the call. Who is on the call? I think a little bit more context would be helpful.

MR. HARTMAN: Sure.

THE COURT: Thank you.

BY MR. HARTMAN:

Q. Mr. Stumberger, the participants on the call who are listed here are yourself, Mr. Rohr, Mr. Calabrese, Mr. Hild and Mr. Foster, is that right?

A. Yes.

Q. And I think we've heard about all those people at various points, and I think that's stipulated to. Was this call convened for the purposes of discussing this issue?

A. Yes.

Q. OK. So, I'm sorry, just to come back to the question that I asked you, why was it that Mr. Rohr was suggesting that you might need to talk to a dealer in advance based on your understanding of the conversation?

A. Based on my understanding, it was, it was to make, you know, have the dealer come up with a valuation on certain bonds that would match the valuation that Wedbush saw at IDC.
Q. Why not just give Wedbush any dealer?
A. My recollection is that's what happened.
Q. OK. But in the context of this conversation, why was that not something that you were envisioning?
A. Can you repeat that? Me or --
Q. Well, why was the proposal -- based on your understanding, why was the proposal to talk to the dealer in advance rather than just to give the dealer's name to Wedbush?
A. It's what I said. Without a conversation, there was the potential for valuations on bonds that Wedbush sent to the dealer that would be off from what they saw on IDC.
Q. OK. Now, you say, "There is a chance he already knows."
Who is the "he" that you're referring to here?
A. Scott, Scott at Wedbush.
Q. That's line 36. And when you say, "He knows," what were you referring to there?
A. I'm referring to the fact that he may know that the valuations, the prices he's lending against are higher than market.
Q. OK. Go ahead and play, Ms. Troy.
(Audio played)
MR. HARTMAN: Let's pause right there.

BY MR. HARTMAN:
Q. Mr. Stumberger, you say, "There is a story and a narrative that supports that but I don't think that even matters."
Why did you say "I don't think that even matters"?
A. I said that because, even though there was a relative value discussion that maybe made sense, it didn't matter, because the repo lenders only cared about whether they could sell bonds at market prices.
MR. DUSING: Objection. Foundation, the thoughts of the repo lenders.
THE COURT: Yes. Why don't you lay the foundation first for that.
BY MR. HARTMAN:
Q. Was that your understanding? Was that why you said that?
A. Yes.
THE COURT: And what was that understanding based on?
What was that understanding based on?
THE WITNESS: The fact that the lenders, you know, would be -- the way they operated and in the agreement was they were relying on market prices and the prices at which they were lending were higher.
Q. Mr. Stumberger, you outline what you describe as the scariest scenario.
And you say the snariest scenario, this is beginning at line 66, you say, "Obviously, is -- you know, Scott gets the

color."

So first of all, what's the "color"? What are you referring to?

A. What I'm referring to there is what Scott or Wedbush would get, pricing information on the CUSIPs he checked with the dealer.

(Continued on next page)

BY MR. HARTMAN:
Q. And he gets this when he calls up IDC. Why are you initiating it by calling IDC?
A. Because he would see potentially a big price change delta between the price information from the dealer and what he's looking against from IDC.
Q. When you say "delta," what do you mean by that?
A. The difference.
Q. Then I checked with the dealer and the dealer says this is seven points lower.
What is the seven points lower he's referring to there?
A. The difference I'm speaking about.
Q. The difference in price between IDC and where the spot check might come out?
A. Yes, in this example.
Q. And then you say: The IDC clerk says: Will these come from broker quotes?
What are broker quotes?
A. Broker quotes are prices that IDC accepts from, in this case, Live Well or other brokers.
Q. Can you envision Mr. Hild asking IDC who is the broker, and then you say I don't know if IDC can disclose that or not. And you say then that gets even hairier.
What were you referring to there that would get

hairier?
A. The recognition that Live Well was the broker delivering the prices to IDC.
Q. And why would that get hairier?
A. Because that wasn't the intention of the relationship of the business.
MR. DUSING: Objection, foundation.
THE COURT: If you can explain to us where -- when you say the intention, what are you talking about, what's your basis for saying that?
And again, all these objections and my rulings are getting at the fact that for any individual witness that person testifies what was in their mind, what was their state of mind, but not what someone else's state of mind. That's what I'm trying to get at. Why did you understand that to be true?
THE WITNESS: I understood it to be true because in conversations and the repurchase agreement documentation between the lender and Live Well it specified they are lending it to market price.
THE COURT: You may proceed.
Q. And did it also specify that that market price would be provided by a third party?
A. Yes.
MR. DUSING: Objection. I may not have heard market price again.

THE COURT: Can you repeat the question, please?

MR. HARTMAN: Sure.

Q. The question was just did that agreement also specify the market price would be provided by a third party?

THE COURT: You can answer that.

A. Yes.

MR. HARTMAN: Ms. Troy, you can keep playing.

(audio recording played).

Q. Mr. Stumberger, when Mr. Rohr talked about picking someone who was slimy, who would be willing to be slimy for you, did you understand what he meant by that?

A. Generally, yes.

Q. What was your understanding?

A. Similar to the previous request, have a conversation with a dealer in advance of giving that dealer's information to Wedbush and have a conversation about what Live Well was doing.

Q. Why would that be slimy, to your understanding?

A. Well, is the question why would that be slimy or if I'm a slimy person?

Q. Why would you need to find a slimy person and why would that person -- why would that person doing what you described be slimy, as you understood it?

A. Because it would be representing to Wedbush that the valuations are market and they weren't.

MR. HARTMAN: Ms. Troy, let's go forward in this

exhibit to line 557, and this is on page 21 of the transcript in front of you.

Ms. Troy, whenever you're ready let's play that.

(Audio recording played)

Q. Mr. Stumberger, what do you mean when you told Mr. Hild that that is where the market is?

A. I was explaining the context of where the market was on those bonds.

MR. DUSING: Objection, your Honor. Again, his understanding of where the market was.

Q. Was that your understanding of where the market was?

A. Yes.

Q. And you say Mr. -- you say Scott, that's Scott from Wedbush, is that right?

A. Yes.

Q. You said he cares about what is market, is that right?

A. Yes.

Q. And you say I don't think he cares about that. What's the "that" you're referring to?

A. Can you scroll up the transcript?

My understanding of what that means is responding to Michael's comment above that says that most of the folks out there don't know how to value these, including the big guys. So I'm saying I don't think Scott cares that the folks out there -- there's folks out there who know the value, he cares

about the market.
Q. When Mr. Hild says there's no debating that, did you understand he was agreeing with that statement?
A. Yes.

MR. HARTMAN: Judge, I was going to go on to another topic. I could keep going.

THE COURT: We're so close to the end of the day we might as well end here for the day and we'll start in the morning.

MR. HARTMAN: Okay.

THE COURT: So thank you all. Remember, don't discuss the case. Have a good evening.

(Continued on next page)

(Jury not present)

THE COURT: We'll start at 10:00 tomorrow instead of 10:15. There is another trial, which is why there's congestion, but it's not starting until next week after all.

Did you want to raise something?

MR. DUSING: I want to make sure that the witness is on the stand and he will not be speaking with anyone. There's separation of witnesses. He won't be talking to attorneys through his testimony.

MR. HARTMAN: Judge, my understanding is that rule typically applies on cross. I don't think that typically applies on direct, and certainly -- I think we object strongly to the notion that the witness can't confer with his attorney.

THE COURT: That's usually my understanding is once they're on cross, once direct is finished, then it's improper for them to speak with government counsel, but since he's still on direct, I don't think so.

MR. DUSING: With respect, we understand.

THE COURT: Okay, you can step down.

We're starting again at 10:00 tomorrow.

(Witness not present)

THE COURT: Do you have any issues that you want to raise? Is there anything else that you want to say about the remaining recording? Tell me where you are with that.

MR. DUSING: The defense has been heard, I think the

last issue, on 404.

MR. HARTMAN: Is that what you're asking about?

THE COURT: I'm asking if -- we have the one outstanding issue. I'm asking if anyone has anything else that you want to be heard about or anything else that we need to talk about.

MR. DUSING: Yes and no.

THE COURT: Okay. Fine. What I will say is that as general rule you should come a few minutes early. If you know that there's an issue that comes up overnight and you want to talk about it, let my chambers know and I will get here earlier if I can if I don't have another proceeding. But give me notice, because what I don't want to do is keep the jury waiting.

Have a good night.

MR. HARTMAN: Have a good night, Judge.

MR. DUSING: Good night.

(Adjourned to April 15, 2021 at 10:00 a.m.)

INDEX OF EXAMINATION

Examination of: Page

DARREN STUMBERGER

Direct By Mr. Hartman . . . . . . . . . . . . . . .50

GOVERNMENT EXHIBITS

Exhibit No. Received

104 and 2001 . . . . . . . . . . . . . . . . . .88

105 . . . . . . . . . . . . . . . . . . . . . .92

110 . . . . . . . . . . . . . . . . . . . . . .95

113 . . . . . . . . . . . . . . . . . . . . . .99

114 . . . . . . . . . . . . . . . . . . . . . 104

2009, 402-1, 402-2, and 402T . . . . . . . . . 117

115 . . . . . . . . . . . . . . . . . . . . . 129

404-T and corresponding recording . . . . . . 136

405T . . . . . . . . . . . . . . . . . . . . 146

405-1 . . . . . . . . . . . . . . . . . . . . 146

118 . . . . . . . . . . . . . . . . . . . . . 150

128 . . . . . . . . . . . . . . . . . . . . . 151

413 and 413T . . . . . . . . . . . . . . . . 153

138 . . . . . . . . . . . . . . . . . . . . . 159

407T . . . . . . . . . . . . . . . . . . . . . 167

407-1 and 407-2 . . . . . . . . . . . . . . . 167